**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Veronza Leon Curtis BOWERS,
Defendant-Appellant.**

No. 74–2524.

United States Court of Appeals,
Ninth Circuit.

April 1, 1976.

As Modified on Denial of Rehearing and
Rehearing En Banc June 11, 1976.

Doron Weinberg (argued), of Stender, Stender & Weinberg, San Francisco, Cal., for defendant-appellant.

John G. Milano, Asst. U.S. Atty. (argued), San Francisco, Cal., for plaintiff-appellee.

## OPINION

Before BROWNING and CHOY, Circuit Judges, and LUCAS,* District Judge.

PER CURIAM:

Appellant was convicted of murdering Kenneth C. Patrick, park ranger employed by the United States Park Service, in violation of 18 U.S.C. § 1114. We affirm.

The park ranger's body was found beside Mount Vision Road in Point Reyes National Seashore. He had been shot three times with an Astra Pistol using 9 mm ammunition of Yugoslavian manufacture. Three spent 9 mm shell casings were found nearby. One was of Yugoslavian manufacture; another of Finnish manufacture bore the marking "VPT 44." Four crossbow bolts fitted with hunting tips were also found in the immediate area.

* Honorable Malcolm M. Lucas, United States District Judge for the Central District of California, sitting by designation.

Evidence developed in subsequent investigation indicated that appellant Bowers, Alan Veale, and Jonathan Shoher had been stopped by the park ranger while on an expedition to poach deer, and appellant Bowers had shot the ranger. Appellant and Alan Veale were indicted for murder. The cases were severed for trial, appellant Bower's trial to lead. Veale elected to testify against appellant. After appellant's conviction, the indictment against Veale was dismissed.

1. Items seized during the search and introduced at trial included pieces of crossbow equipment, (including the type of hunting tip found at the scene of the murder), a pamphlet describing the Point Reyes National Seashore, documents bearing the names of appellant Bowers and Alan Veale, a clip or magazine for a 9 mm Spanish Astra pistol, several rounds of 9 mm ammunition, including some of Yugoslavian manufacture, a Finnish round marked "VPT 44," another round which a government expert testified had once been chambered in the murder weapon, and an inoperable 9 mm pistol.

2. The undersigned, being duly sworn, deposes and says:

1. That he is a Special Agent of the FBI, and that, while acting as such, had occasion to investigate the murder of one KENNETH C. PATRICK on August 5, 1973, on Mount Vision Road, Point Reyes National Seashore Park, Olema, California.

2. That, on Sunday August 5, 1973, at the time of his death, KENNETH C. PATRICK was on duty in his official capacity as a U.S. National Park Service Ranger.

3. That, a U.S. National Park Service Ranger is a Federal Officer as defined in U.S.Code, Title 18, Sections 111 and 1114.

4. That your affiant was informed by HERB GERCKE, Chief Law Enforcement Officer, Point Reyes National Seashore, that, up until approximately 1970 when a National Park was established at Point Reyes, that game hunting of the white deer that inhabit the area was permitted. GERCKE further informed your affiant that the poaching of white deer at said National Park is fairly common. GERCKE advised that the Park Rangers increase their poaching patrol activity at the beginning of each deer season. GERCKE noted that deer season had begun this year on August 4, 1973. Your affiant was further informed by GERCKE that, subsequent to the death of Ranger PATRICK, GERCKE learned from PATRICK's wife, TOMI PATRICK, that PATRICK had informed her on the morning he was killed that he suspected poaching activity in the area and was going out to the FAA road, also known as the Mount Vision Road, to look for poachers.

1. The contention pressed most strongly by appellant is that the district court erred in denying a motion to suppress certain evidence seized during a search of a residence at 976 Vernal Road, Mill Valley, California.[1] The search was conducted pursuant to a search warrant. Appellant contends that the affidavit submitted to the magistrate did not establish probable cause. The affidavit is set out in full in the margin.[2] We are to pay "substantial defer-

5. That your affiant has observed the following items of evidence taken from the scene of said murder:

   a. One VPT 44 Finnish remanufactured nine millimeter shell casing

   b. One Yugoslavian shell casing having the numbers 11, 52, as well as two asterisks thereon

   c. One Winchester Western 9 millimeter shell casing

   d. Two bullets removed from the body of KENNETH C. PATRICK, which the FBI Laboratory, Washington, D.C. has identified as being the same type of bullet as the bullets which are normally encased in the Yugoslavian type casings as opposed to the above Finnish and Winchester type casings

   e. Four crossbow bolts, 17½ inches in overall length, orange in color with silver and green crests, with bear head arrow tips with one slot on each tip for razor blade inserts

   f. One Saturday Preview to Sunday Chronicle Newspaper dated 8/5/73

   g. One pair of black-rimmed wrap-around sun glasses, non-prescription type

   h. One empty Budweiser 12 ounce beer can

6. That your affiant determined from his investigation at the above crime scene that only one of the three 9 millimeter shell casings found in the area were of the Yugoslavian type.

7. That your affiant was informed by SA STEPHEN LEE KIES that he received information from a confidential informant, which informant has furnished KIES with reliable information which has aided in the investigation of approximately 25 pending Federal Bureau of Investigation cases, that said informant had observed ALAN VEALE in possession of a crossbow in Berkeley, California, approximately five months ago. Your affiant was informed by KIES that he received the above information from said confidential informant on September 10, 1973.

8. That your affiant talked to a confidential informant which informant advised that he had recently engaged ALAN VEALE in a conversation in which VEALE confessed to the murder

ence" to the decision of the magistrate. *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct.

of the above Park Ranger. That certain details contained in VEALE's confession to the informant have been corroborated by independent and extensive investigation. Additionally, some of the details furnished by VEALE to the informant were such that they could only have been known to someone present at the murder scene as that scene has been reconstructed. That said confidential source advised your affiant that in the course of VEALE's confession to the informant VEALE directly implicated an individual named DAAU (Phonetic). Said confidential informant further advised your affiant that DAAU is an individual who was formerly a captain with the Black Panther Party in Richmond, California. Said confidential source further described DAAU to your affiant as a Negro male, approximately 28 years old, 5 feet 6 inches, 150 pounds, wears a full beard, light complexion, and is from "back East". Said informant advised your affiant that DAAU is married to a white female and they have a child. The informant stated that DAAU resided in an apartment at Third and Bryant Streets or Third and Brannen Streets, San Francisco, California.

9. That your affiant was informed by SA STEPHEN LEE KIES that the above individual named by the confidential source as DAAU is identical with VERONZA LEON CURTIS BOWERS alias DAOUD BEY, FBI Number 325 91H. KIES stated that BOWERS San Francisco file shows BOWERS to have come to the Bay Area from Omaha, and to have been a former captain of the Black Panther Party, Richmond Chapter, Richmond, California.

10. That on September 7, 1973, your affiant learned of the arrest of ALAN W. VEALE that same date by FBI Agents in Berkeley, California, on a charge of robbing the Bank of America, Shattuck-Vine Branch, 1536 Shattuck Avenue, Berkeley, on September 6, 1973. Your affiant was informed by SA STEPHEN LEE KIES that same day that the arrest was based on the positive identification of VEALE from a bank robbery surveillance camera photograph by KIES.

11. That, on September 10, 1973, your affiant, along with SA RICHARD L. WEAVER, FBI, and CHARLES W. CRANE, Berkeley, California Police Department, interviewed ALAN W. VEALE at that department. That, during the course of said interview, VEALE admitted being at the scene of the above murder when the above ranger was killed. VEALE stated during the course of the interview that he, along with two other individuals who he declined to name, departed from 574 Third Street, San Francisco, California, at approximately 11:00 p. m. the night before the murder. VEALE further advised that they drove to the Point Reyes area in Marin County, arriving there at approximately 1:00 a. m. That a vehicle occu-

1509, 1512, 12 L.Ed.2d 723, 726 (1964); *see also Jones v. United States,* 362 U.S. 257,

pied by a Park Ranger came up the hill, passed their vehicle, turned around and came up behind them. The ranger signaled their vehicle to stop by use of a red light. That, at that time, he, VEALE, was sitting in the rear seat of the vehicle occupied by the three, the other two individuals being seated in the front seat. VEALE further indicated to your affiant that he did not shoot the ranger. That, during the interview, SA WEAVER asked VEALE if the murder of the ranger had bothered him. VEALE indicated in reply, "Man you just forget about it". VEALE stated they were there poaching deer.

12. That your affiant was informed by Sergeant CHARLES W. CRANE, Berkeley Police Department, that CRANE had determined from a police records check, that ALAN W. VEALE date of birth September 6, 1949, had been arrested on a Berkeley Police Department Traffic Warrant at 574 Third Street, Apartment 201, San Francisco, California, on August 24, 1973. CRANE further advised that the police report of the arrest indicated that the arresting officer, HENRY RAKAY, had found a briefcase containing papers in the above San Francisco apartment in the name of JONATHAN Z. SHOHER, along with various items of Communist literature.

13. That your affiant was informed by SA JOHN CONWAY that the latter searched the above San Francisco apartment on September 11, 1973, with the consent and assistance of the landlord, PLEASANT KIRK, the apartment being vacant on that date. That SA CONWAY advised your affiant that the following items were found, among others, during the course of the search:

a. One empty 50 round box of Remington 9 millimeter parabellum bullets.

b. One Motorland magazine bearing the dates July/August 1973, and bearing a label addressed to JONATHAN Z. SHOHER, 642 Beacon Street, Oakland, California;

c. Several notes addressed to "JON", including a note to "Jon" from Marlene.

d. One cardboard box addressed to KATHY KING, Box 42294, San Francisco, California 94142.

e. Three (sic) Sports Illustrated magazines bearing dates June 18, 1973 and August 13, 1973, addressed to DIANE MONTGOMERY at 510 Third Street, San Francisco, California, 94107.

f. One note bearing the word "group" telephone number 832–1717.

g. One drug prescription receipt from Skaggs Drugs Center, 2655 Overland, Boise, Idaho, for J.R. KING, prescribed by Dr. JOHNSTON on April 10, 1973, RX Number 144010.

270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697, 707 (1959). Doing so, we conclude that the affi-

14. That your affiant was informed by SA CONWAY that the latter interviewed PLEASANT KIRK regarding the occupants of Apartment 201 at the above address on September 11, 1973. That CONWAY informed your affiant that, out of seven photographs shown, KIRK selected a mug photograph of VERONZA LEON CURTIS BOWERS, JR., as the individual who appeared identical with a Negro male who came to the above San Francisco apartment at 574 Third Street on approximately August 26, 1973, requesting that he be allowed to enter the apartment and pick up some belongings of his brother's, ALAN VEALE. KIRK informed CONWAY that he allowed the individual who identified himself as VEALE's brother to remove some items from the apartment after obtaining a written release purportedly signed by ALAN VEALE.

15. That on September 7, 1973, your affiant received the following information from Sergeant CHARLES W. CRANE, Berkeley, California Police Department:

That a Berkeley Police Department records check by CRANE determined that ALAN W. VEALE was arrested by that Department on April 4, 1973, for altering the license plates on a 1955 Chevrolet, California license 309 FCQ, which car was then registered to STEPHANIE BOWERS 3422 Andover Street, Oakland, California.

That a check of the California Department of Motor Vehicle Computer System (PIN) by CRANE determined that one JONATHAN Z. SHOHER, date of birth September 10, 1945, with an address of 2105 Harrington Street, Oakland, California, received a moving traffic citation while driving the above 1955 Chevrolet, and as a result a warrant was issued in January, 1973.

That a further check by CRANE with the above computer system determined that JONATHAN Z. SHOHER, date of birth, September 10, 1945, had also received two parking citations on a 1971 Volkswagen Bus, California license 372 DRC, which plate was registered to SHOHER at 3841 Telegraph Avenue, Oakland, California.

16. That, while unsuccessfully attempting to locate SHOHER at 3841 Telegraph Avenue, Oakland, your affiant talked to the present occupant of that address, MARY TRUEBLOOD. The latter advised that SHOHER, a neat appearing white male in a business suit, seemed very secretive about his residence address. She further stated that SHOHER stopped by on numerous occasions to pick up mail at the Telegraph Avenue address after he moved from there.

17. That, on September 10, 1973, your affiant was informed by SA RICHARD L. WEAVER that he had been informed that same day by JOSEPHINE R. TAMAYO that STEPHANIE

davit was sufficient, though by no great margin. The general basis of our conclu-

BOWERS gave TAMAYO the above 1955 Chevrolet in approximately March, 1973. TAMAYO described herself to SA WEAVER as ALAN VEALE's girl friend.

18. That your affiant determined that the above 1971 Volkswagen Bus had been sold on July 3, 1973, to Westlake Motors, 7400 Westlake Boulevard, Daly City, California, and resold by that agency on August 5, 1973, to RICHARD L. EVANS, 1754 Waller Street, San Francisco, California. That your affiant further determined from Westlake Motors, that on July 3, 1973, JONATHAN Z. SHOHER purchased from that agency a 1973 Pontiac Grand Prix, burgundy red vinyl top over black body. California license 086 JKK, Vehicle Identification Number 2K57T3A237203, which car is presently registered to SHOHER.

19. That, on September 11, 1973, your affiant interviewed RICHARD L. EVANS who stated that, approximately two weeks before, he had refurbished the interior of the above Volkswagen, and that while doing so, had found a bullet under the rear seat of same, along with two .22 caliber shell casings. EVANS advised that he had disposed of the shell casings but had retained the bullet, which he furnished to your affiant. Upon examination of the bullet received from EVANS your affiant determined it to be a nine millimeter bullet with markings "VPT 44" on the shell casing.

20. That your affiant determined from Omaha, Nebraska FBI file Number 115–143 that one VICKI LYNN MC INTYRE was interviewed by FBI Agents in Omaha on May 29, 1973, at which time she advised as follows:

In February, 1972, MC INTYRE was living with VERONZA BOWERS (phonetic), also known as DAUD. BOWERS had purchased some guns for the Black Panther Party and was going to Oakland, California. BOWERS took about five or six guns back to California with him, and MC INTYRE recalled BOWERS always carrying a .45 caliber pistol with him. BOWERS, accompanied by MC INTYRE and her two children, left the Council Bluffs, Iowa area in February, 1972, and drove to Oakland, California, in a red and white Volkswagen Van which belonged to JOHN SHORES (phonetic) Oakland, California. BOWERS was "kicked out" of the Panther Party following his return to Oakland because he wanted to move on things too quickly. BOWERS then decided to start his own revolutionary group. MC INTYRE could not recall the name of BOWERS' group, but did recall that BOWERS buried the guns in the basement of their Oakland residence. MC INTYRE could not recall the exact address of same but described it as a big old two story brown building on East 32nd Street, near an "Easy Drive" store.

sion is this: the circumstances of the mur- der and the evidence found at the scene

MC INTYRE lived at the above Oakland residence for approximately one year along with the following:

STEPHANIE BOWERS, a white female, approximately 30 years old, wife of VERANZO BOWERS;

JOHN SHORE (phonetic), white male, approximately 28,

LINDA SHORE (phonetic), white female, approximately 24,

CATHY KING (phonetic), white female, approximately 24.

During the year in Oakland, BOWERS and other occupants of the house held meetings of a revolutionary nature. MC INTYRE also recalled seeing books by Mao-Tse Tung and other Communist material at these meetings.

21. That your affiant was advised by SA RICHARD L. WEAVER that a confidential informant who had furnished information on at least three occasions, which information was corroborated, determined that LINDA SHOHER, JONATHAN SHOHER, KATHY KING, STEPHANIE BOWERS, an individual named DAUD (phonetic), and on some occasions ALAN VEALE, had formerly resided in a commune in Oakland, California. The commune subsequently moved to San Francisco, and then on to Mill Valley, California. Said confidential source advised that JONATHAN SHOHER was into "Communist stuff", and that he and KATHY KING held good jobs and supported other non-working members of the above commune.

22. That your affiant was informed by SAs WEAVER and KIES that they received information from JOSEPHINE TAMAYO, girl friend of ALAN VEALE, that a car which she described as a 1973 Pontiac Grand Prix, burgundy red over black in color, had circled the block on which she resides in Berkeley, California, on the night of September 10, 1973, following the arrest of ALAN VEALE. TAMAYO further informed WEAVER and KIES that she observed the same car circling the Federal Building block at 450 Golden Gate Avenue, San Francisco, California, when she came over to attend a court appearance for ALAN VEALE on September 11, 1973. TAMAYO stated she saw the car once on the morning of September 12, 1973, in the vicinity of her Berkeley residence. TAMAYO stated she feared for her life.

23. That affiant was further informed by WEAVER and KIES that they received information from JOSEPHINE TAMAYO that she had called ALAN VEALE at a Mill Valley, California telephone number in late July or early August, 1973. She stated that the number would appear on her telephone bill, and that there would be only one Mill Valley number appearing on her bill.

24. That your affiant, on September 10, 1973, had occasion to search the personal effects of JOSEPHINE TAMAYO following her arrest at the Berkeley Police Department on that date. That, among TAMAYO's effects affiant located a Pacific Telephone Company bill dated July 17, 1973, showing two separate charges for calls to Mill Valley, California telephone number 388–7483. That your affiant caused a check to be made through Deputy BOWEN BRIDGES, Marin County Sheriff's Office, who determined from the Pacific Telephone Company that the above number was listed to EDWARD ANDERSON at 976 Vernal Road, Mill Valley, California.

25. That your affiant, on September 13, 1973, personally observed a 1973 Pontiac Grand Prix, California license 086 JKK, burgundy red over black in color, parked in front of 976 Vernal Avenue, Mill Valley, California.

26. That, on September 14, 1973, SA EUGENE POGUE, FBI, informed your affiant that he had personally observed the above Pontiac Grand Prix being driven by an individual who closely resembles a California driver's license photograph of JONATHAN Z. SHOHER depart from the Mill Valley address. That your affiant caused a surveillance to be conducted of said car on the same date, and that the car was determined to have been ultimately parked, approximately 45 minutes after its departure from Mill Valley, in the Hearst Building Garage, Third and Market Streets, San Francisco, California.

27. That your affiant was informed by SA STEPHEN JENKS, FBI, that JENKS had determined from officials at Tymshare, Inc., 690 Market Street, San Francisco, that JONATHAN Z. SHOHER was employed by that corporation, and had furnished a home address of 446–60th Street, Oakland, California.

28. That your affiant has caused various FBI Agents assigned to the San Francisco Office to check addresses of 2105 Harrington Avenue, 642 Beacon Street, 3841 Telegraph Avenue, and 446–60th Street, all in Oakland, California, in an effort to determine a permanent residence for JONATHAN SHOHER. All such investigation has proved negative at the above Oakland addresses.

29. That your affiant was informed by SA PAUL A. SCHUMACHER, FBI, that the latter had interviewed on Sept. 13, 1973 KEN RAND and RICHARD HALLINAN, both employees at the Sand Dollar Bar, 3458 Shoreline Highway, Stinson Beach, California. That both men had independently selected a photograph of VERONZA LEON CURTIS BOWERS, JR., out of a group of ten photographs shown, as an individual who had come into the above bar between 11:00 p. m. on a Saturday night and 1:00 a. m. the following Sunday morning approximately one month ago. According to RAND and HALLINAN, the individual had been accompanied by another Negro male and a white male. RAND advised that he recalled the incident and the men, as not many black people enter the

suggested the existence of other undiscovered objects evidencing the crime,[3] in the main, these objects were of a kind (guns, ammunitions, archery equipment, clothes) likely to be found where the persons involved lived; and a web of circumstances connected appellant, Veale, and Shoher to each other, these three to the murder, and Veale and Shoher to the house to be searched.

■ Appellant is particularly insistent that the affidavit did not establish probable cause to believe the evidence of the crime would be found at the Mill Valley address.[4] "The magistrate is not required to determine whether *in fact* the items to be searched for are located at the premises to be searched, but only whether there is *reasonable ground* to believe they are there." *United States v. Damitz*, 495 F.2d 50, 55 (9th Cir. 1974). This standard is met. From the information in the affidavit the magistrate could reasonably infer that at least some of the objects sought were probably at the Mill Valley address, even though "the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely" to conceal the property sought. *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970).[5] The

above bar. SA SCHUMACHER informed your affiant that RAND stated that one comes to the Pt. Reyes National Seashore area after driving approximately 16 miles north of the Sand Dollar Bar along the Shoreline Highway. RAND further stated that in his opinion, the most direct route to the Pt. Reyes area from Mill Valley, California was along the Shoreline Highway through Stinson Beach, noting that the Pt. Reyes area was not too accessible.

30. That your affiant has determined from maps, public records, and his general knowledge of the area, that the distance from Mill Valley, California to the Pt. Reyes National Seashore is approximately 25 miles.

3[1]. That investigation of the suspects ALAN VEALE, VERONZA BOWERS, also known as Daud Bey, and JONATHAN SHOHER, as well as surveillance of these individuals, has eliminated any connection between these individuals and any personal vehicle other than the 1973 Pontiac Grand Prix, more fully described in the application for search warrant, at the time of the murder of Ranger PATRICK on August 5, 1973. Based upon this investigation, it is your affiant's opinion that the vehicle occupied by the suspects at the time of the murder of Ranger PATRICK is the same 1973 Pontiac Grand Prix referred to above.

3. The warrant listed the following as the objects of the search: "firearms, ammunition, spent shell casings, hunting equipment, clothing, and footgear, archery equipment, traces of deer carcasses."

4. The affidavit was found insufficient on this ground in a prosecution of appellant Bowers in the Alameda County Superior Court. *People v. Bowers*, Crim. No. 12812 (Jan. 23, 1975).

5. Appellant argues that the affidavit did not sufficiently establish the reliability of two unnamed informants (note 2, paras. 8 and 21). The government asserts that appellant waived this issue. In denying the motion to suppress, the district court stated that the parties had agreed that questions relating to reliability of the informants were to be heard at a later time; the court reiterated this statement in denying a motion to reconsider. Even if the court was in error, appellant was on notice that the question of reliability had not been resolved, and it was incumbent upon appellant to raise it later if he wished to challenge the affidavit on this ground. He did not do so. In any event, the denial of the motion to suppress in this respect was not error. It is reasonable inference that both of the unnamed informers in question based their statement upon personal knowledge (note 2, paras. 8 and 21). The statement that the Veale confession given to the first unnamed informant had been corroborated by independent investigation, and included details that would be known only to one familiar with the murder (note 2, para. 8) may be conclusory in a sense, but heretofore we have not required that the details of the corroborative information be stated. *See United States v. Wong*, 470 F.2d 129, 131 (9th Cir. 1972). The same may be said of the statement that the second unnamed informer had furnished information on three prior occasions which had been corroborated (note 2, para. 21). Moreover, some of the information was corroborated by sources referred to in the affidavit (note 2, paras. 12, 20, 27). Reading the affidavit as a whole and giving the language a common sense and realistic interpretation (*United States v. Harris*, 403 U.S. 573, 577, 91 S.Ct. 2075, 2078, 29 L.Ed.2d 723, 730 (1971)), the requirements of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), were met.

objects sought were of a kind likely to have been retained for the six weeks that elapsed between the murder and the search,[6] and, as we have said, would probably be found where the perpetrators lived. Veale had admitted involvement in the murder (note 2, paras. 8, 11). A bullet similar in size and markings to ones found at the murder scene had been discovered in a car owned by Shoher (notes 2, paras. 5, 19). Veale's San Francisco apartment had been searched and the objects sought had not been found (note 2, para. 13). A group of which appellant, Shoher, and sometimes Veale, were a part, had moved to Mill Valley (note 2, para. 21). Veale's girlfriend had twice telephoned Veale at the Mill Valley address (note 2, paras. 23, 24). Shoher's car (note 2, para. 18) had been seen parked at this address (note 2, paras. 25, 26).

2. We agree with the district court that appellant failed to make a sufficient showing to require the government to affirm or deny that his counsel's telephone had been tapped. Assuming the showing was sufficient to establish electronic surveillance had occurred, nothing offered suggested any connection between the claimed surveillance and this proceeding, as required by *United States v. Alter*, 482 F.2d 1016, 1026 (9th Cir. 1973). *See United States v. Vielguth*, 502 F.2d 1257, 1260 (9th Cir. 1974); *United States v. See*, 505 F.2d 845, 856 (9th Cir. 1974). The only possibly relevant showing concerned a telephone conversation between counsel and appellant's wife, but the affidavits revealed that this conversation occurred many months before the murder and related to legal problems concerning children who were living with the Bowers.

Since the appellant made no showing requiring a government response, he cannot complain because the government voluntarily furnished certain tapes to the court for *in camera* inspection. *United States v. See, supra.*

3. Appellant contends that the prosecution was guilty of misconduct in failing to reveal that a prosecution witness had committed perjury before the grand jury. Witness Darnell Phillips testified before the grand jury that Alan Veale told him, "We [Veale and Bowers] shot the ranger." Phillips later testified (at a trial other than appellant's) that Veale told him "Daoud [Bowers] shot him." Assuming *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974), applies, the failure of the prosecutor to notify the court and the grand jury of the change in Phillips' testimony was harmless beyond any doubt. Both versions of Phillips' testimony implicated Bowers. Appellant's counsel was aware of the alleged perjury well before trial, but made no motion to dismiss the indictment.

4. A government witness was allowed to testify that he had made a microscopic comparison of one of the bullets found in the ranger's body with a bullet found in appellant's attache case and that in his expert opinion the marks on these bullets indicated they had been loaded into the same gun (not the murder weapon). Appellant objected to the admission of this opinion on the ground that there was no showing that "tool mark identification" was generally accepted as sufficiently reliable to justify admission of expert opinion based upon its use. Appellant fails to distinguish between the procedure and its application to the particular case. The record was sufficient to permit the trial court to conclude that "tool mark identification" rests upon a scientific basis and is a reliable and generally accepted procedure.[7] Whether its use in the particular case resulted in a reliable opinion was a different question, to be ex-

---

6. This distinguishes such cases as *Durham v. United States*, 403 F.2d 190 (9th Cir. 1968).

7. The trial court has a wide discretion in determining whether particular scientific tests are sufficiently reliable to permit expert testimony based upon their results (*United States v.*

*Franks*, 511 F.2d 25, 33 (6th Cir. 1975); *United States v. Stifel*, 433 F.2d 431, 438 (6th Cir. 1970)), and whether the probative value of such testimony will exceed its prejudicial effect (*United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973)).

plored in cross-examination of the expert witness. The jury was properly instructed to give the expert testimony such weight as the jury thought it deserved.

■ 5. Appellant cites four statements of the prosecuting attorney to the jury as misconduct. As to three of these there was no objection at trial and no request for a corrective admonition. None of the three constitute plain error. *United States v. Perez*, 491 F.2d 167, 173 (9th Cir. 1974). The statement objected to was to the effect that the prosecution would not have been allowed to prove that at the time of the murder appellant was wanted by law enforcement officers, thus providing a motive for the murder. If the statement was error, it was error shared by the trial court and clearly made in good faith. On the whole record, it was harmless.

Affirmed.