UNITED STATES of America,
Plaintiff-Appellee,

v.

Sidney FRIED, Defendant-Appellant.

No. 77–3403.

United States Court of Appeals,
Ninth Circuit.

May 12, 1978.

Rehearing and Rehearing En Banc
Denied July 17, 1978.

John G. Milano, of Milano & Cimmet, San Francisco, Cal., for defendant-appellant.

F. E. Dawson, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before WALLACE and ANDERSON, Circuit Judges, and EAST,* District Judge.

* The Honorable William G. East, United States District Judge, District of Oregon, sitting by designation.

WALLACE, Circuit Judge:

Fried appeals his conviction by a jury for violating 18 U.S.C. § 2314 by transporting in interstate commerce stolen property valued in excess of $5,000. We affirm.

I

In December 1976, it was discovered that seven negotiable Weyerhauser Company debentures, each having a face value of $100,000, were missing from the offices of a New York City clearing house which had received them from a seller for delivery to his buyer. Both the buyer and the seller were located in New York City; both presumed that the bonds had been stolen.

On January 2 or 3, 1977, Dorward, who was in San Francisco, received a call from DiRodio, who was apparently in Las Vegas, in which DiRodio said that he had access to some bonds that could serve as collateral for a loan Dorward was trying to arrange. DiRodio gave Dorward the serial number, year of maturity, and other identifying data corresponding to one of the missing debentures. In answer to Dorward's question, DiRodio assured him that there was nothing wrong with the debentures, that "they were not on any list, hot list."

A few days later, DiRodio, Guglielmini, and Herko met with Dorward at a San Francisco Holiday Inn (the Inn). Although DiRodio said that they had the debentures with them, Dorward was not shown any of the missing securities at that time. He was again assured that they were "not on any [hot] list at the present time."

Dorward, in trouble with the law on an unrelated matter, decided to act as an informer and contacted the FBI. The FBI was unable immediately to verify that the debentures described by DiRodio were stolen and asked Dorward to stall the three men. Guglielmini and Herko, who had brought the debentures with them from New York, said that they could not remain in San Francisco that day, but would return with the bonds the next Monday if plane fare were provided.

Thereafter, the FBI determined that the bond DiRodio had described was from among those missing in New York. Tickets for a flight from New York to San Francisco were purchased for Herko and Guglielmini by the FBI. DiRodio then called Dorward to inform him that another man, Sidney Fried, would also be coming from New York. It was agreed that Fried would pay his own plane fare; as it turned out, however, Fried used the ticket purchased for Guglielmini.

Dorward picked up DiRodio at the airport in San Francisco on Monday morning, January 10, 1977, and the two went to room 332 of the Inn where Herko and Fried were waiting. Dorward and Fried were introduced to each other and exchanged greetings. Then Herko, DiRodio, and Dorward proceeded to discuss the debentures, and one of them was produced for Dorward's inspection. Fried was in room 332 during this discussion but he did not participate in the conversation or, according to him, even overhear it. Dorward and DiRodio then left with the debenture.

Dorward and DiRodio bought a new envelope for the debenture, then went to an office building in San Francisco where FBI Agent Robinson was posing as an attorney who would inspect the bond. DiRodio remained outside on the sidewalk while Dorward met Robinson. Upon ascertaining that the debenture was from among those stolen in New York, Robinson sent men out to arrest DiRodio. Other agents went to the Inn and arrested Herko and Fried. Some time later Guglielmini arrived at the Inn; he voluntarily went to FBI headquarters for questioning and was arrested there. A search warrant for room 332 was subsequently obtained and executed. Hidden in a chair cushion were two more of the missing debentures.

After their arrest, the suspects, except for Herko, who apparently chose to remain silent, gave various explanations for their presence in San Francisco. Fried told FBI agents that Herko had offered him a free trip to San Francisco which he had accepted in order to visit a friend there. He said

"that it's not unusual that he uses names of other people on tickets for himself because he travels quite a bit." He claimed that he did not know DiRodio or Dorward and that he did not even hear the conversation that took place when Herko, DiRodio, and Dorward discussed the debentures.

DiRodio claimed that he had met with no one that day except Dorward and that Dorward had had the debenture all along. He said that "he didn't know what the bond was."

During questioning before his arrest, Guglielmini denied any knowledge of the missing debentures. After being arrested, he claimed acquaintance with Herko only. He said he did not know DiRodio or Dorward; the record does not disclose whether he was asked about Fried.

The arresting officers found in Herko's possession an address book bearing the names and telephone numbers of Fried, Guglielmini, DiRodio, and Dorward. Fried's name was also found on a piece of paper in Guglielmini's wallet.

Fried was tried together with DiRodio, and both were convicted. Fried now urges four grounds for a reversal of his conviction.[1] We find none of them persuasive.

## II

Fried first argues that the warrant under which room 332 at the Inn was searched was illegally issued because the underlying affidavit of Agent Robinson was inadequate. In particular, Fried alleges that the affidavit failed to show that a federal offense had been committed, that the informer (Dorward) was reliable, or that the objects of the search might be in room 332. For these reasons, contends Fried, the district judge was in error when he denied the pretrial motion to suppress the evidence seized during the search, which included two of the missing debentures.

■■■ The principles governing the sufficiency of search warrant affidavits are by now well established. Where, as here, the affidavit is based upon the hearsay declarations of an informer, the magistrate issuing the warrant must be presented with at least some of the facts from which the informer concluded that the objects to be seized are indeed located at the place to be searched, and with some of the underlying circumstances from which the affiant has determined that the informer is credible and his information reliable. *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). In the absence of a description of how the informer gathered his information, the latter requirement is satisfied if the informer has described the criminal activity in sufficient detail to assure the magistrate of his reliability. *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

■■■ From the affidavit the magistrate need only conclude that criminal activity is probably shown; a prima facie demonstration is not required. *Id.* at 419, 89 S.Ct. 584; *United States v. Mulligan*, 488 F.2d 732, 736 (9th Cir. 1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974). In reaching his conclusion, the magistrate should read "the affidavit as a whole[,] . . . giving the language a common sense and realistic interpretation . . . ." *United States v. Bowers*, 534 F.2d 186, 192 n.5 (9th Cir.), *cert. denied*, 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976); *accord, United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970).[2] Thus,

---

1. DiRodio also appealed his conviction which was reversed by this court, 565 F.2d 573 (9th Cir. 1977), because the post-arrest statements of Fried were found to have been erroneously entered against him.

2. As the Supreme Court put it in *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965):

   [T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted

while we insist that probable cause be shown, we give "great deference" to the decision of the magistrate who concludes that such a showing has been made. *Spinelli v. United States, supra,* 393 U.S. at 419, 89 S.Ct. 584; *United States v. Bowers, supra,* 534 F.2d at 188–89.

■ Measured against this standard, we have little trouble finding that the search warrant was properly issued. The affidavit of Agent Robinson[3] was based largely upon the statements of Dorward who had seen and handled one of the missing debentures in room 332 and subsequently delivered it to Robinson. The affidavit specifically identified the bond as one of those presumed stolen in New York.

Fried argues that since the affidavit did not specifically state that the value of the missing property was over $5,000 or show that it had moved in interstate commerce, necessary elements of the section 2314 offense were not shown to exist. But the magistrate was entitled to infer that since the debentures were apparently stolen in New York and at least one of them was now in San Francisco, they were probably transported in interstate commerce by one or more of the suspects. The magistrate could also properly use common knowledge to support the conclusion in the affidavit that the securities were possessed in violation of section 2314 which requires that the property be worth more than $5,000. We agree with the district judge "that the magistrate doesn't have to close his mind to the affairs of the world to know that debenture bonds customarily are traded in amounts of $1,000 or more" and that others of the seven missing securities might well have accompanied the one obtained by Dorward.

The magistrate also had probable cause to believe that room 332 was the place where the property would be located. The fact that those possessing the debenture had displayed it in a hotel room suggested that, like other travelers, they would likely keep all their belongings in that place. *See United States v. Lucarz, supra,* 430 F.2d at 1055.

Finally, the magistrate was justified in believing Dorward to be credible. The affidavit stated that Dorward saw and handled one of the debentures, that he noted the serial number, and that the bond was personally given by Dorward to the affiant. Although the affidavit did not directly vouch for Dorward's reliability, the production by Dorward of the debenture itself weighs heavily in favor of his reliability, *United States v. Fluker,* 543 F.2d 709, 714 (9th Cir. 1976), as does the detail with which the missing property and the manner

under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

3. The affidavit reads as follows:
   Being duly sworn I state that:
   I am a Special Agent with the Federal Bureau of Investigation located in San Francisco, California.
   On January 10, 1977, Special Agent FREDERICK A. GROSS advised the affiant that Special Agent LARRY KENNEDY, Federal Bureau of Investigation, New York City, New York, advised him that the Securities Section, Chemical Bank and Trust Company, New York, stated that MORGAN STANLEY, a Securities Broker, 55 Water Street, New York City, reported that Weyerhauser Sinking Fund Debenture numbers RU3535–RU3536 and RU3553–RU3557 were to have been delivered to him by December 20, 1976. As of January 10, 1977 he had not received them and considers them stolen.
   On January 10, 1977, GEORGE DORWORD [sic] advised the affiant that at approximately 11:00 AM on January 10, 1977, he was present in Room 332, Holiday Inn, Fisherman's Wharf, 1300 Columbus Avenue, San Francisco, where he observed a large brown manila envelope lying on a table in the room. DORWORD stated that he observed ROBERT HERKO take from this manila envelope two pieces of paper and place them in an open suitcase which was in Room 332. DORWORD stated that HERKO then gave the manila envelope to "ART" DI RODIO, who then gave it to DORWORD. DORWORD said that he immediately examined the contents of the envelope and observed Weyerhauser Sinking Fund Debenture RU3557. He subsequently supplied this security to the affiant.

in which it was received were described. *Cf. United States v. Archuleta,* 446 F.2d 518, 520 (9th Cir. 1971) (informant's tip given in sufficient detail to provide probable cause for arrest).

We conclude that the magistrate had probable cause to issue the search warrant. The motion to suppress was therefore properly denied.

## III

■ Fried next contends that the district judge should have granted his motion to dismiss the indictment against him. He argues that the grand jury was not presented with sufficient evidence to show that the federal offense charged had been committed at all, and that there was, in any event, no probable cause shown that Fried himself was involved in any criminal activity.

The district judge concluded that he was foreclosed by *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), from inquiry into the sufficiency of the evidence upon which the indictment was based, but that even if he were not, he would rule that the grand jury had properly indicted Fried.

As authority for the proposition that the trial court was entitled to dismiss the indictment for insufficiency of the evidence before the grand jury, Fried cites the dicta in *United States v. Fox,* 425 F.2d 996, 1001 (9th Cir. 1970): "A decision to quash an indictment because of the admission of incompetent evidence [before the grand jury] lies in the sound discretion of the trial court." However, we believe we are bound by the statement of the Supreme Court in *Costello* that

[i]f indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

350 U.S. at 363, 76 S.Ct. at 408 (footnote omitted); *accord, Lawn v. United States,* 355 U.S. 339, 348–50, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). We therefore conclude that we are compelled to affirm the district judge's holding that he was foreclosed from making an inquiry into the sufficiency of the evidence presented before the grand jury.

## IV

■ Fried's third argument is that the post-arrest statements of Guglielmini (who was tried separately) and DiRodio were improperly admitted into evidence against him. His entire argument is premised on the notion that the testimony of the FBI agents, by which the statements were put before the jury, constituted hearsay evidence. Because DiRodio and Guglielmini had already been arrested, Fried claims any conspiracy was necessarily concluded and the "coconspirator exception"[4] to the hearsay rule was not applicable.

As authority, Fried relies upon *United States v. DiRodio,* 565 F.2d 573 (9th Cir. 1977), in which his codefendant successfully appealed his conviction to this court on the ground that Fried's post-arrest statement should not have been admitted against him (DiRodio). In *DiRodio,* however, the government relied upon Fried's statement to buttress the credibility of Dorward. Thus, the statement was offered for the truth of the matter asserted and was clearly hearsay. *Id.* at 575–76. In this case, it is clear from the record that the post-arrest

---

**4.** Under Fed.R.Evid. 801(d)(2)(E) statements by a coconspirator "during the course and in furtherance of the conspiracy" are actually treated not as coming within an exception to the hearsay rule, but simply as nonhearsay. This rule, however, continues to be referred to as the "coconspirator exception."

statements of DiRodio and Guglielmini were offered not for their truth, but because the government believed they were obviously false. The statements were therefore not within the definition of hearsay at all.[5]

The Supreme Court recently encountered the same question in *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). In that case, the demonstrably false testimony of two men at an election contest hearing was introduced against themselves and others on trial for conspiracy to cast fictitious votes in the election. The Supreme Court held that even if the conspiracy had ended, the statements were admissible:

> We think it plain [that the statements] were not [hearsay]. Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted. The election contest testimony . . ., however, was not admitted into evidence . . . to prove the truth of anything asserted therein. Quite the contrary, the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false.

*Id.* at 219–20, 94 S.Ct. at 2260 (footnotes omitted).

Here, as in *Anderson,* the government desired merely to have the jury compare the coconspirators' exculpatory statements with "other admissible evidence"—Dorward's testimony—to prove the inconsistency. The statements were not hearsay.

## V

Finally, Fried raises two contentions concerning the sufficiency of the evidence against him. He first argues that the prearrest statements of his alleged coconspirators as testified to by Dorward were improperly admitted. He also contends that the evidence was insufficient to go to the jury.

■■■ Under Fed.R.Evid. 801(d)(2)(E), of course, statements by coconspirators made during the course and in furtherance of the conspiracy are not subject to a hearsay attack. But in order to invoke this rule, there must be, independent of the statements, (1) evidence that the conspiracy existed and (2) at least slight evidence connecting the defendant with it.[6] *United States v. Dixon,* 562 F.2d 1138, 1141 (9th Cir. 1977).[7] As the evidence is clearly adequate to prove a conspiracy existed, the only question remaining on the admissibility issue is whether there was at least slight evidence connecting Fried to it.

5. Fed.R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

6. As we stated in DiRodio's appeal, we appropriately discuss the coconspirator exception to the hearsay rule even though conspiracy was not explicitly charged since the government's case depended upon a showing of a common criminal plan or venture. 565 F.2d at 575 n.3.

7. In *United States v. Dunn,* 564 F.2d 348 (9th Cir. 1977), we recently reviewed the quantum of evidence necessary to support a conspiracy conviction. We there held that both the existence of the conspiracy and the defendant's connection thereto must be proved beyond a reasonable doubt. *Id.* at 356–57. In the case before us, however, we are not concerned with the quantum of evidence necessary to support a conspiracy conviction, but rather the quan-

tum necessary to admit a coconspirator's statements pursuant to Fed.R.Evid. 801(d)(2)(E).

In our view, these situations require the application of differing rules. When considering the question of sufficiency of evidence, fundamental legal principles require that each element of the offense be proven beyond a reasonable doubt. When considering admissibility, however, sound judicial policy militates in favor of placing probative and reasonably credible evidence before the trier of fact.

While some of the reasoning of *United States v. Dixon,* 562 F.2d 1138 (9th Cir. 1977), has been called into question by *Dunn,* the holding itself has not been affected. Accordingly, we reaffirm our position announced in *Dixon* that admission of a coconspirator's statement under Rule 801(d)(2)(E) requires substantial evidence of the existence of the conspiracy and "slight" evidence of the defendant's connection to the conspiracy. *Id.* at 1141.

■ The record reveals the following facts, independent of any coconspirator statements: (1) Fried and conspirator Herko accompanied the stolen debentures from New York to San Francisco; (2) Fried used a ticket purchased by the FBI for conspirator Guglielmini who, along with Herko, had previously met with Dorward about selling the debentures; (3) Fried was present in room 332 of the Inn when Dorward was shown one of the stolen debentures and was later arrested there; (4) the subsequent search of the room in which Herko and Fried were staying disclosed two more of the missing debentures; (5) Herko and Guglielmini had Fried's name and telephone number on their persons. Clearly, this is at least slight evidence to connect Fried with the conspiracy and, therefore, the pre-arrest statements were admissible.

■ The final issue raised by Fried was whether the evidence was sufficient to go to the jury. The test we apply is whether the evidence against Fried, as construed most favorably to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), was sufficient to allow the jury to conclude beyond a reasonable doubt that he was guilty.

■ In applying this test, we may consider not only the evidence identified in determining the admissibility of the pre-arrest statements, but we now may also consider the pre-arrest statements themselves. While we agree with the district judge that the evidence was not overwhelming, we also agree with him that the evidence was sufficient to go to the jury on the issue of whether Fried aided and abetted the commission of the crime.[8]

AFFIRMED.

---

8. Although Fried was not charged as a conspirator but as a principal, analysis under the coconspirator exception to the hearsay rule was properly used to determine the admissibility of some of the evidence against Fried. *United States v. DiRodio, supra,* 565 F.2d at 575 n.3. We are satisfied, however, that the jury verdict against Fried as a principal was proper. As the trial judge instructed the jury, a principal is anyone who "aids, abets, counsels, commands, induces or procures [the] commission" of an offense against the United States. 18 U.S.C. § 2(a).