GAUDIN, Judge.
Calvin B. Smith was convicted of receiving stolen things valued at more than $500.00, a violation of LSA-R.S. 14:69, by a six-person jury in the 23rd Judicial District Court. He was sentenced to five years at hard labor and fined $500.00 plus court costs. In default of not paying the fine, he was given an additional six months’ imprisonment.
Smith’s assignments of error are (1) that the trial judge erred in not quashing the search warrants and suppressing evidence seized thereunder, (2) that the guilty verdict was contrary to the evidence and (3) that the imposed sentence was constitutionally excessive.
We find no merit in assignments (1) and (2), but, considering appellant’s background and felony-free past, we are of the opinion that assignment No. 3 is valid and that a lesser jail sentence would be more appropriate.
ASSIGNMENT NO. 1
In this assignment of error, Smith alleges that the affidavit annexed to the search warrants was inaccurate and that it was fatally defective in not alleging any criminal activity on Smith’s part or in his store.
LSA-C.Cr.P. art. 162 reads:
“A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant.
*368 “A search warrant shall particularly describe the person or place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search or seizure.”
A lengthy search warrant affidavit was submitted to a district judge by deputies Camille Carnaggio Jr. and Carl Melancon. The original of the affidavit and a carbon copy were used to obtain warrants to search both a store and an adjacent, connected apartment belonging to appellant.
The affidavit reads:
“On Saturday, December 13, 1980, at approximately 6:30 p.m., Detective Camille Carnaggio received a telephone call at his residence. The subject would not state his name, but told Detective Carnaggio the following information: There was a trailer parked in front of Bernie and Creola’s Store on North Railroad Avenue in Luteher. The subject stated that the trailer was a Sealand trailer and that it was loaded with over one thousand (1000) typewriters. He further stated that they were either unloading or loading the typewriters from the trailer to the apartment next to Bernie and Creola’s Store. He also advised that they were carrying more than one box at a time and that it seemed more than just typewriters in the boxes.
“At approximately 6:50 p.m., Detective Carnaggio called Sergeant Kerry Melancon and advised him of what the subject told him on the phone and asked if he would check it out. Detective Carnaggio also stated that he would be enroute as soon as possible.
“At approximately 7:00 p.m., Sergeant Melancon picked up Deputy Irvin Cunningham and advised him of what information Detective Carnaggio had received. Sergeant Melancon and Deputy Cunningham then went to Bernie and Creola’s Store where they saw the Sealand Trailer parked in front of the store. Sergeant Melancon and Deputy Cunningham rode past the trailer. A number SEAU4074010 was noticed on the trailer. Sergeant Melancon copied that number down for further reference.
“At approximately 7:10 p.m., Detective Carnaggio met with Sergeant Melancon and Deputy Irvin Cunningham in front of Dnell’s Fabrics in Lutcher approximately three hundred (300) feet from Bernie and Creola’s Store. It was decided that Sergeant Melancon would go into Bernie and Creola’s Store and ask the people working there about the trailer.
“Sergeant Melancon drove to Bernie and Creola’s and parked directly to the rear of the trailer. Deputy Cunningham stayed in the police vehicle. Sergeant Melancon went into the store and asked a black male subject behind the counter, known to Sergeant Melancon as one of Calvin Bernie Smith’s sons, if he knew about the trailer. The subject stated to Sergeant Melancon that his father, Calvin Bernie Smith, knew of the trailer and that it was there for awhile. Sergeant Melancon then asked the black male subject where was his father. He stated that he did not know where he was at, but everything was okay with the trailer being parked there.
“Sergeant Melancon then attempted to call Calvin B. Smith on the phone to question him in reference to the trailer. He was not to be found at that time.
“Sergeant Melancon went out of the store, followed by Smith’s son, and walked up to the rear of the trailer. He attempted to open the trailer, but could not due to the fact that a pad lock, Slaymaker brand name, was on the trailer.
“Sergeant Melancon then went back to his vehicle where Deputy Cunningham was waiting. Upon entering the vehicle, Deputy Cunningham advised that someone was watching him through the window of the apartment next to the store. At that time a black male subject, last name known to Sergeant Melancon to be Carter, walked out of the apartment and to his vehicle, a blue late model Chevrolet Impala, parked across the street.
“Sergeant Melancon and Deputy Cunningham approached the subject before he got into his vehicle and questioned him in reference to the reason the trailer was *369 parked in front of the store. He was very evasive and uncooperative with Sergeant Melancon and also avoided talking about the trailer. Smith’s son also avoided talking about the trailer at the time he was spoken to be Sergeant Melancon earlier.
“Detective Carnaggio then met with Sergeant Melancon and Deputy Cunningham. They talked about the trailer and decided to just patrol around not thinking anything was wrong with the trailer being parked in front of Bernie and Creola’s Store.
“About 8:00 p.m., a truck drove up to the trailer and attached to it, ready to pull out. At this time neither Sergeant Melancon nor Detective Carnaggio noticed anything except that the driver was a black male. No license information was taken from the truck. The truck pulled out and left.
“On December 15, 1980, at approximately 1:00 p.m., Deputy Karl Melancon, while on normal patrol on US 61 about six miles North of Blind River, found a Sealand Trailer parked on the side of the road. Deputy Melancon checked the trailer and advised that it was open and it was loaded with Sears typewriters.
“Sergeant Melancon was notified at the St. James Parish Sheriff’s Office and left enroute to the scene. Detective Andy De-tillier arrived at the scene with Deputy Melancon. Detective Detillier was asked by Sergeant Melancon to check the number SEAU4074010 to see if it was the same Sealand Trailer that was parked in front of Bernie and Creola’s Store that Saturday Night, the 13th day of December 1980.
“Detective Ditillier advised that the number SEAU4074010 matched and that it appeared that someone went into the trailer.
“Sergeant Melancon arrived shortly af-terwards. The trailer was the same trailer and inside was a large amount of typewriters.
“The trailer was then closed and H. Construction Company was called to haul the trailer to the Sheriff’s Office in Convent where it was stored until something could be found out about the typewriters and the trailer.
“It was learned shortly afterwards that the trailer was stolen and also the typewriters. The stolen report was filed with Jefferson Parish Sheriff’s Office.
“Sergeant Melancon contacted Detective Carnaggio and advised him of what was going on. Detective Carnaggio advised he would be enroute to the Sheriff’s Office as soon as possible.
“Upon arrival, Detective Carnaggio advised that he spoke to a subject by the name of Pat Poche who works at People’s Drug Store in Lutcher, Louisiana, which is located next door to Bernie and Creola’s Store. Mr. Poche advised of the following: On December 13, 1980, at approximately 6:00 p.m., Mr. Camille Carnaggio Sr. and Mr. Poche were standing on the outside of the drug store. Both men noticed the Sea-land Trailer parked in front of Bernie and Creola’s Store with some people unloading some boxes that Mr. Poche observed to be typewriter boxes with a loading cart that he recognized to be from Bernie and Creo-la’s Store. He also recognized one of the black males unloading the typewriters as being the son of Calvin Bernie Smith, the owner of the store. Mr. Poche advised that he saw the black males unloading the trailer that there were approximately 1150 typewriters in the trailer. Mr. Carnaggio Sr. and Mr. Poche then departed from the area.
“On several occasions that black male subject renting the apartment from Calvin Bernie Smith has been reported to be selling narcotics in front of Jake’s Place located in Lutcher, Louisiana, which is located around the said apartment. It is also learned that persons in the neighborhood have seen several bundles of what they believe to be narcotics loaded into the rear of the apartment.”
After obtaining the warrants, deputies went to Smith’s store and apartment. A search of the apartment was fruitless, but when the officers searched the store they found 24 stolen typewriters in a storage room.
*370 Appellant makes a two-prong attack on the affidavit, arguing that the affidavit contains intentional misrepresentations and that it does not establish probable cause for searching the store.
The affidavit states, near the end, that Pat Poche “... recognized one of the black males unloading the typewriters as being the son of Calvin Bernie Smith...” Poche testified that he did not so advise the police officers.
Such a misrepresentation, appellant contends, constitutes a fraud upon the courts, requiring quashing of the warrants in accord with State v. Rey, 351 So.2d 489 (La.1977), and U.S. v. Thomas, 489 F.2d 664, a federal Fifth Circuit decision.
When Carnaggio testified, he said:
“This is the statement that he (Poche) had given me. This is what he told me at his home that evening.”
In any event, the part about Poche is almost at the end of the affidavit and it came long after probable cause for issuance of the warrants had been shown. This inconsistency would be meaningful only if the trial judge or an appellate court concluded, after considering the testimony of the witnesses and all circumstances relating to the obtaining of the warrants, that there had in fact been an intentional misrepresentation. The trial judge did not make such a finding, nor do we.
The affidavit initially tells of the anonymous telephone call to Carnaggio, advising him of the trailer parked in front of Smith’s store. Further, the caller said that typewriters and possibly other items were being carried from the trailer to the apartment. The affidavit then states:
(1) That police officers investigated and did in fact find a trailer parked in front of Smith’s store;
(2) That one of appellant’s sons told a deputy that Smith “... knew of the trailer ...” and that “... everything was okay with the trailer being parked there;”
(3) That two days later, the very same trailer containing some typewriters was found abandoned on U.S. Highway 61; and
(4) That the trailer and typewriters had been stolen.
Had the search warrants issued immediately after the telephone call and without further inquiry by the police, the warrants would have been illegal. But the officers did investigate and when they learned that the trailer and typewriters had been stolen, they had reason to search Smith’s store and apartment.
The store and apartment owned by Smith were under one roof. Actually, the storage room where the typewriters were located was between the store and apartment and was connected to the apartment by an unlocked passageway. To get to the storage area from inside the store, deputies had to remove a lock and take down obstructing boards from a door.
At the suppression hearing, officers said that warrants were sought for both the store and apartment because the typewriters could have been placed in either the store or the apartment.
In State v. Poree, 406 So.2d 546 (La.1981), the Supreme Court of Louisiana said:
“Probable cause exists when facts and circumstances, within the affiant’s knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched. State v. Turnipseed, 362 So.2d 486 (La.1978); United States v. Chester, 537 F.2d 173 (5th Cir.1976); United States v. Damitz, 495 F.2d 50 (9th Cir.1974).
“The affidavit must show a sufficient nexus between the items to be seized and the place to be searched. Without direct observation, the appropriate connection may be manifested by the type of crime, the nature of the items sought, the extent of opportunity for concealment, and normal inferences as to where a criminal would be likely to hide the instrumentalities and fruits of the crime. United *371 States v. Lucarz, 430 F.2d 1051 (9th Cir.1970).
“The items sought — a handgun, clothing, money, and a money-bag — are objects which one might expect to find at a person’s residence. Poree’s residence is close to the sites of the crime and his arrest; there was ample opportunity for him to return home after the crime, change clothes, and hide these items. United States v. Morris [491 F.Supp. 222 (S.D.Ga., 1980) ]. The affidavit, taken as a whole, contains sufficient facts to support a reasonable determination that probable cause existed to search defendant’s residence. See State v. Baker, 389 So.2d 1289 (La.1980); State v. Guidry, 388 So.2d 797 (La.1980); United States v. Bowers, 534 F.2d 186 (9th Cir.1976).”
Here, too, the affidavit, taken in a whole, even with the Porche segment excluded, does itemize more than enough information to support a reasonable determination that probable cause existed to search both the store and apartment. After having been unloaded from the trailer, the “fruits of the crime” could easily have been deposited in any part of the complex owned by Smith. The totality of circumstances analysis, established by Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and recognized in Louisiana, justifies the instant warrants.
A magistrate’s determination of probable cause is entitled to significant deference. See State v. Rodrigue, 437 So.2d 830 (La.1983). Accordingly, we find that the affidavit in question, with or without the Poche part, does state sufficient probable cause for issuance of the warrants.
ASSIGNMENT NO. 2
In his second assignment of error, Smith says that the evidence was insufficient to support his conviction. The most damaging testimony against appellant was given by Kenneth Alexander, who actually stole the trailer from the Kansas City Southern Railroad yard and brought it to Smith’s store.
Alexander said that Smith had given him the serial number of the trailer to be stolen and also given him instructions to deliver the trailer to Smith’s store. Alexander testified that he later met Smith and delivered approximately 150 typewriters to appellant’s home in Convent, Louisiana. This testimony was partially corroborated by Joseph Ricard, who was with Alexander when the trailer was stolen from the railroad yard and then taken to Smith’s store.
Smith denied being a part of any scheme to steal the trailer, and contends that the jury should have believed him and not Alexander and Ricard.
At the time of this offense, LSA-R.S. 14:69 provided in pertinent part that receiving stolen things is the intentional procuring, receiving or concealing of anything of value which has been the subject of any robbery or theft, under circumstances which indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses.
In State v. Nguyen, 367 So.2d 342, 344 (La.1979), the Supreme Court of Louisiana held that the crime of receiving stolen things consists of four elements:
(1) The procuring, receiving or concealing must have been intentional,
(2) The thing or things procured, received or concealed must have a value,
(3) The thing or things must have been stolen, and
(4) The circumstances must show that the offender knew or had reason to believe that the thing or things had been stolen.
Smith contends that (1) and (4), above, were not proven. However, if the jurors chose to believe Alexander and Ricard, and apparently they did, all of the elements of receiving stolen things were established and the guidelines of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), were not offended.
The State offered other proof, both direct and circumstantial, in proving Smith’s guilt, but we see no reason to dwell further on the sufficiency of proof.
*372 True, some of Alexander’s testimony was inconsistent and he did testify for the State in accord with a plea-bargaining agreement,[1] hoping for leniency, but these considerations were before the triers of fact. We cannot say that the jury’s findings were wrong or that the record does not support these findings. See State v. Richardson, 425 So.2d 1228 (La.1983), wherein the Supreme Court of Louisiana said:
“In the ease before us, defendant asks that we evaluate the credibility of the witnesses and overturn the trial court on its factual determination of guilt. This is not the function of this court on appeal.”
Likewise, it is not our function here to upset the jury’s factual findings.
ASSIGNMENT NO. 3
Smith’s five-year sentence is within the statutory limit but it may nonetheless be reviewed for excessiveness. See State v. Russell, 397 So.2d 1319 (La.1981), and State v. Sepulvado, 367 So.2d 762 (La.1979).
Appellant was 43 years of age at time of the crime. Although he had a traffic conviction in 1982, he was officially classified as a first offender.
He had been married but once to Creóla Smith, with whom he lived until her recent death. Four children (sons) were born to this couple, and all are doing well.
Smith was employed as a juvenile officer with the St. James Parish Sheriff’s Office for many years prior to his conviction. He had served in the U.S. Army, been a professional baseball player and was a volunteer in civic and community endeavors. He was, the trial judge said, “... well thought of...”
In giving Smith five years, the trial judge correctly pointed out that Smith served as a “... role model for the youth of the parish...” and that he had violated “... his oath of office and the trust placed in him ...”
However, the trial judge also stated that “... there is an undue risk that during the period of a suspended sentence or probation, this defendant would commit another crime...” Nothing in the record or in Smith’s history suggests such a probability-
While receiving stolen things valued at over $500.00 is serious, it is a non-violent offense. Under the special circumstances of this ease, we believe that the five-year sentence was excessive and that Smith’s many law-abiding, productive years should have been given more recognition.
The State, in its brief, argues that the imposed sentence was warranted, but we were not provided with even one case in which a first felony offender received a five-year sentence for violation of R.S. 14:69.
For these reasons, we affirm Smith’s conviction and fine, but we set aside his five-year sentence and remand to the district court for resentencing.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

. Alexander received a 30-month sentence.