**UNITED STATES of America, Plaintiff,**

v.

**Raymond M. FREITAS, Walter Freitas, Jonny E. McClellan, Defendants.**

**No. CR–85–0025 EFL.**

United States District Court,
N.D. California.

June 14, 1985.

---

Eric Swenson, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Penelope M. Cooper, Berkeley, Cal., Tom Nolan, Nolan & Parnes, Palo Alto, Cal., J. Tony Serra, San Francisco, Cal., for defendants.

## SUPPRESSION ORDER

LYNCH, District Judge.

The defendants in this case are charged with manufacturing methamphetamine in violation of 21 U.S.C. section 841(a)(1), and with conspiracy to commit the above offense in violation of 21 U.S.C. section 846. The instant matter involves a motion to suppress evidence filed by defendant Raymond Freitas and joined in by co-defendants Walter Freitas and Jonny McClellan. The Government opposes the motion and also objects to the joinder of Walter Freitas and McClellan on the ground that those defendants lack standing. This opinion addresses the legality of the search as to Raymond Freitas only. A separate opinion will be issued at a later date regarding the joinder of Walter Freitas and McClellan.

### I. Background

On December 12, 1984, Magistrate Wayne D. Brazil issued search warrants for eight locations: (1) 9839 Crestview Drive, Clearlake, California; (2) 7237 Skyline Boulevard, Oakland, California; and (3) six different storage lockers, identified by number, at Mission Mini Storage, 26869 Mission Boulevard, Hayward, California. The warrants were based upon an affidavit submitted by Drug Enforcement Administration Agent Steven P. Wood, which contained information compiled during an investigation of a possible scheme to manufacture controlled substances. Affidavit of Steven P. Wood [hereinafter referred to as the "Wood affidavit"]. In addition to reciting the actions and observations of DEA

agents during the course of the investigation, the Wood affidavit included reports of ten separate tips from an anonymous informant regarding Raymond Freitas' alleged involvement in the clandestine manufacture and distribution of methamphetamine. Each of the warrants required that the search be conducted on or before December 16, 1984.

On December 13, Magistrate Brazil issued a warrant purporting to authorize a surreptitious entry and search of the same Clearlake residence for which a search warrant had been obtained the previous day. The affidavit in support of the Government's application referred to the existing warrants, described surveillance information placing Raymond Freitas at the house in Clearlake on December 12, and stated the affiant's belief that a methamphetamine laboratory may have been constructed at the residence. Affidavit of Laura M. Hayes [hereinafter referred to as the "Hayes affidavit"]. Beyond this, the affidavit merely stated that "[i]t would be advantageous for the investigation and safety of the surrounding residents if agents were able to enter 9839 Crestview Drive and determine the status of the laboratory, and any chemicals that may be present." Hayes affidavit, ¶ 9.

A surreptitious nighttime entry and search of the Clearlake residence was conducted on December 13. The agents observed extensive laboratory equipment and chemicals used in the manufacture of methamphetamine. A partial list of the items observed by the agents was prepared and delivered to the magistrate, but because these requirements were deleted from the warrant, no property was seized nor was a copy of the warrant left at the premises. On December 17, the Government applied for an order extending the date of the original search warrants issued on December 12. The application was made in the form of a motion by Assistant United States Attorney Eric Swensen and was supported by a brief supplemental affidavit from Agent Wood which described the laboratory equipment and other items observed during the surreptitious entry into

the Clearlake residence. Based upon this information, the Government alleged that Freitas and other persons would return to the residence in order to manufacture methamphetamine. Magistrate Brazil thereupon extended the execution date of the warrants to December 26 in a short written order on December 17. The warrants were executed on December 20 and numerous items of evidence were seized which the defendant seeks to have suppressed.

## II. The Original Search Warrants

The defendant challenges the validity of the eight search warrants issued on December 12 on the grounds that the Wood affidavit contained insufficient facts to support the magistrate's finding of probable cause, and that even if the warrant is determined to be sufficient on its face, certain facts were intentionally or recklessly omitted from the affidavit so as to make it substantially misleading.

### A. The Facial Sufficiency of the Wood Affidavit

 The first issue with respect to the eight original warrants is whether "the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–2333, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960)). When issuing the warrant, the task of the magistrate is "simply to make a common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* 462 U.S. at 238, 103 S.Ct. at 2332. Scrutiny as to the sufficiency of the affidavit does not take the form of *de novo* review; rather, "[a] magistrate's 'determination of probable cause should be paid great deference by the reviewing courts.' "

*Illinois v. Gates,* 462 U.S. at 236, 103 S.Ct. at 2331 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590 (1969)). *Accord Massachusetts v. Upton,* —— U.S. ——, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984); *United States v. Miller,* 753 F.2d 1475, 1479 (9th Cir.1985); *United States v. Estrada,* 733 F.2d 683, 684 (9th Cir.), *cert. denied,* 105 S.Ct. 168 (1984); *United States v. Mendez-Jimenez,* 709 F.2d 1300, 1302 (9th Cir.1983).

### 1. The Reliability of the Informant

■ The most important factor in evaluating the sufficiency of the Wood affidavit is the reliability of the anonymous informant, since his information was essential to the probable cause showing for each of the warrants. The informant's tips caused the DEA to initiate its investigation of Raymond Freitas, guided the agents during the course of the investigation, and established the link between Freitas' activities and the alleged drug manufacturing scheme. In order to satisfy the probable cause requirement, the Wood affidavit must provide a substantial basis for crediting the hearsay statements of the informant. *See Jones v. United States,* 362 U.S. at 269, 80 S.Ct. at 735; *United States v. Beusch,* 596 F.2d 871, 874 (9th Cir.1979).

Although the affidavit does not indicate the basis of the informant's knowledge, it does provide corroboration for several important facts included in his tips, including his allegation that Raymond Freitas had manufactured, and was about to manufacture, methamphetamine. The informant's first tip on July 27, 1984 provided then current information that Freitas was operating a methamphetamine lab at his cabin in Clearlake. This tip was supported by information from local law enforcement officers who told the DEA that there had been complaints of strong chemical odors emanating from the Clearlake residence in July and August, 1984, and that the officers had observed hoses running from the house to the lake. According to an agent qualified to render such opinions, these two

facts indicated that it was likely that a clandestine drug laboratory was in operation at the time.

In two telephone calls on December 3 and December 5, 1984, the informant notified the DEA that Freitas was going to leave Oakland to begin manufacturing methamphetamine either at a location north of Sacramento or at his cabin in Clearlake. On December 9, while agents were following Freitas and other unidentified persons from Mission Mini Storage to a hardware store, the informant called again to inform the DEA that Freitas and others were loading equipment for the manufacturing operation and preparing to leave for the lab site. During the next nine hours, agents watched Freitas and several other unidentified persons load Freitas' motor home with boxes and proceed to Clearlake. After reaching the Clearlake area, the motor home stopped at a grocery store where agents observed one of the passengers in the vehicle purchase several large blocks of ice. Two days later, the agents observed a person leave the Clearlake residence and proceed to a store in Clearlake where he bought four additional bags of ice. A DEA chemist noted in the affidavit that ice is commonly used in the manufacture of methamphetamine. The affidavit also related the agents' observations that the windows in the lower level of the Clearlake residence were covered and that there was a hose running from the house to the lake. Two DEA agents familiar with the investigation of clandestine drug labs opined that these facts indicated the existence of a lab on the premises.

The agents' substantial verification of these two tips provides persuasive evidence of the informant's reliability. *Illinois v. Gates,* 103 S.Ct. at 2335-36. *See also United States v. Roberts,* 747 F.2d 537, 549 (9th Cir.1984); *United States v. Camp,* 723 F.2d 741, 745 (9th Cir.1984). The informant's knowledge of otherwise innocent facts about Raymond Freitas' personal life,[1] the technical accuracy of certain of his com-

---

**1.** The informant supplied accurate and relative-

ly detailed information regarding the location

ments regarding Freitas' alleged drug manufacturing activities,[2] and the fact that Freitas had a previous conviction on drug charges and a reputation within the DEA for being involved in methamphetamine manufacturing lend additional support to this conclusion.

■■■ In response to this evidence, the defendant emphasizes that the informant supplied a great deal of other information that was either incorrect or not verified by the investigation, and that these facts are sufficiently compelling to negate any inference of credibility. Specifically, the defendant points to several inaccurate statements the informant made regarding the time the alleged manufacturing operation would begin, and also by the agents' failure to corroborate other information the informant provided, particularly his allegation that Raymond Freitas was actively associated with Earl Link and a person known as "Lefty." It is true that the informant was mistaken in several of his tips as to the precise date the manufacturing operation would take place,[3] but this fact alone does not necessarily weaken the informant's credibility. The magistrate could have easily determined that the incorrect dates simply reflected last-minute changes in plans of which the informant was unaware. Similarly, the inability to confirm the informant's tips regarding Freitas' active involvement with Link and

"Lefty" is not significant by itself; rarely is it possible to verify every detail provided in a tip. In any event, there is no requirement that the informant be "infallible," *Illinois v. Gates*, 462 U.S. at 245 n. 14, 103 S.Ct. at 2335 n. 14, particularly where, as here, there is a logical explanation for the error and the information upon which the agents relied is independently verified. The Court therefore concludes that the informant's tips were sufficiently reliable under the "totality of the circumstances" to affirm the magistrate's finding of probable cause.

### 2. The Storage Lockers

■ The defendant asserts that even if the informant's tips were sufficiently reliable to establish probable cause as to the Clearlake residence and Raymond Freitas' home in Oakland, it was not established as to the storage locker units. The defendant points to the fact that although Freitas was observed entering Mission Mini Storage several times on December 7 and once again on December 9, Freitas' movements inside the facility were never discerned. Moreover, given the agents' suspicions at this time that Freitas was loading equipment in preparation for the journey to the lab site, the defendant argues that the only logical conclusion was that he had already

---

of certain houses and condominiums owned by Raymond Freitas, the telephone number of Freitas' cabin in Clearlake, and a description of Freitas' automobiles.

**2.** The informant stated, for example, that Freitas had purchased several six-foot glass tubes from a chemical company, which the agents described as being similar in nature to condensing columns used in synthesizing methamphetamine. The informant also stated that Freitas had attempted to run a batch of methamphetamine in an area of Lake County known as Cobb Mountain, but was unable to obtain enough electricity for the process. The agents confirmed that large amounts of electricity are used in the manufacture of methamphetamine.

**3.** The informant first stated that the manufacturing operation would begin during the week of October 23, 1984. On November 1, the informant advised the DEA that Freitas and his asso-

ciates did not begin the operation as planned because "they didn't feel right about it," but that they would begin instead on November 7. Agents maintained surveillance of Freitas' house in Oakland over the next two weeks, but little activity was observed. On November 15, the informant called to say that Freitas had conducted a "test run" during the past three days. No specific mention was made of the November 7 date, but it appears that the manufacturing did not commence on that day as predicted. On November 26, the informant stated that Freitas and the others would be "gearing up shortly" to proceed to the lab site. On December 3, the informant stated that Freitas was leaving for the lab site that day, but on December 5, the informant called to say the trip was rescheduled to December 7 or 8. Finally, on December 9, the informant stated that Freitas and the others were loading up and leaving immediately, which was substantially confirmed by the agents' observations.

taken whatever materials might be relevant to the investigation out of the lockers.

Implicit in the defendant's arguments is a demand for proof substantially greater than what is necessary to establish probable cause. *Cf. United States v. Fried*, 576 F.2d 787, 790 (9th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978); *United States v. Mulligan*, 488 F.2d 732, 736 (9th Cir.1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974). Freitas' visits to the storage facility at this time strongly suggested that he was removing equipment to be used in the manufacturing operation. Although the agents were unable to observe Freitas' movements inside the facility, the affidavit contains information obtained from the manager of the facility linking Freitas to the six lockers identified in the warrant. Two of the lockers were leased to Freitas, and at one time or another Freitas had exercised control over the other four lockers, which were registered to persons mentioned elsewhere in the affidavit and implicated in the investigation. Since there was a reasonable likelihood that further evidence of illegal activity would be found where it was believed that incriminating materials had been stored, the warrants are supported by probable cause.

### B. Misrepresentations and Omissions in the Affidavit

The defendant also charges that certain facts were misrepresented in or omitted from the Wood affidavit which vitiate probable cause. Specifically, the defendant objects to (1) the affidavit's failure to include the results of the DEA's investigation and surveillance of Earl Link; (2) the omission of any reference to the fact that the individual identified by the informant as "Lefty" was not determined to be Freitas' partner and did not accompany Freitas to the lab site, as the informant had stated; (3) the "gross overstatement" and "mischaracterization" of the Lake County Sheriff's

Department's investigation of unusual chemical odors emanating from the Clearlake residence in mid-July, 1984; (4) the affidavit's failure to disclose the identity of the "anonymous" informant, even though the agents knew who the informant was and why he might have a vindictive motive for cooperating in the investigation; and (5) the affidavit's substantial misrepresentation of the information obtained from the manager of the Mission Mini Storage facility.

■ In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that facially valid search warrant affidavits may be challenged if (1) the affidavit contains intentionally or recklessly false statements, and (2) the statements are material in the sense that they were necessary to the finding of probable cause. *Id.* at 171–72, 98 S.Ct. at 2684–2685. *Franks* makes clear that an affidavit supporting an application for a search warrant is presumed to be valid, and that the defendant must make a "substantial preliminary showing" of the falsehood in order to be entitled to a hearing. *Id.* The offer of proof "must be more than conclusory and must be supported by more than a mere desire to cross-examine." 438 U.S. at 171, 98 S.Ct. at 2684. The proferred evidence "should point out specifically the portion of the warrant affidavit that is claimed to be false," and "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished." *Id.*

■ In this case, the defendant has clearly failed to meet the high threshhold showing required by *Franks* for any of the alleged misrepresentations or omissions.[4] As for the defendant's allegations that the agents failed to include information indicating that the informant's statements regarding Earl Link and "Lefty" were incorrect, the investigative reports do not support the defendant's version of the facts. The in-

---

4. Although the Ninth Circuit has never explicitly decided whether the *Franks* rationale applies to omissions, this rule has been followed in the leading cases. *See United States v. Roberts*, 747 F.2d 537, 546 n. 9 (9th Cir.1984); *United States v. Lefkowitz*, 618 F.2d 1313, 1317 n. 3 (9th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980).

formation omitted from those reports is inconsequential and certainly does not suggest anything approaching an intent to deceive the magistrate. *See, e.g., United States v. Brooklier,* 685 F.2d 1208, 1221 (9th Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); *United States v. Young Buffalo,* 591 F.2d 506, 510–11 (9th Cir.), *cert. denied,* 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979). Moreover, as the Court has already determined, the informant's credibility was sufficiently strong that mistaken references to Freitas' association with Link and "Lefty" would not have affected the probable cause showing.

█ The other three claims are similarly unsubstantiated. The only allegation that is supported by anything other than the "information and belief" of defense counsel is the charge that agents overstated and mischaracterized their discussions with Lake County Sheriff's Department deputies about complaints the Department received on the Clearlake house in July, 1984. Although the defendants submitted an affidavit from a private investigator who interviewed one of the Sheriff's deputies, the statements in his affidavit do not differ in any significant respect from the agents' reports. The Court therefore concludes that the defendants have failed to meet the burden necessary for a *Franks* hearing as to the validity of the eight original search warrants.

### III. The Extension Order and the Surreptitious Entry Warrant

█ The defendant objects to the extension order issued by Magistrate Brazil on December 18 on the grounds that the order was void on its face, and also that the order was fatally tainted by the surreptitious entry on December 13. With regard to the facial validity of the extension order, the defendant argues that there is no provision in Rule 41 for extending the period of a search warrant, and that the original warrants could not be "extended" anyway since they had already become void on December 17 by their own terms. Although the proper procedure would have been for the agents to apply for new warrants rather than "extensions" of the December 12 warrants, *see Sgro v. United States,* 287 U.S. 206, 210–12, 53 S.Ct. 138, 140–141, 77 L.Ed. 260 (1932), the defendant does not attempt to argue that the agents and the Assistant United States Attorney used the extension procedure in this case in order to avoid a fresh inquiry by the magistrate into probable cause; on the contrary, the magistrate was presented with a new affidavit which established a much stronger showing of probable cause than when the warrants were originally issued. Under these circumstances, suppression of the evidence obtained as a result of these warrants would clearly be an inappropriate remedy. *See United States v. Leon,* — U.S. —, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

█ The more important issue to be considered is whether suppression may be required because of the agents' surreptitious entry and visual search of the Clearlake residence on December 13, 1984. The defendant contends that there is no such thing as a warrant for a surreptitious entry under the circumstances presented here, and that the magistrate's order extending the original warrants was tainted by the prior illegality.[5] Since virtually all of the

---

**5.** In addition to challenging the facial validity of the surreptitious entry warrant, the defendant also charges that the warrant was not supported by probable cause. Although it is true that the Hayes affidavit was innocuous by itself, Agent Hayes obviously contemplated that her affidavit would be read in association with the facts presented in the Wood affidavit the previous day. In light of the short intervening period of time, the explicit references in the Hayes affidavit to the existing warrants, and the fact that the same magistrate considered both applications, it appears that the Wood affidavit was effectively "before" Magistrate Brazil when he issued the surreptitious entry warrant. *See United States v. Fogarty,* 663 F.2d 928, 930 (9th Cir.1981) (facts presented simultaneously in two related affidavits seeking two warrants may be read together). The unusual result of this interpretation of the circumstances, which only serves to highlight the obvious deficiencies in the surreptitious entry warrant, is that a second warrant was issued on essentially the same probable cause showing and for the same property that a

information contained in the affidavit supporting the magistrate's extension order was derived from the surreptitious entry, it is clear that the searches and seizures conducted on December 20 were products of that entry. If the magistrate's order permitting the surreptitious entry is invalid, then the challenged evidence is subject to suppression as "fruit of the poisonous tree." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). *See also Segura v. United States,* —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Neither the parties nor this Court have been able to locate a single reported case involving a warrant of the type executed on December 13 at Raymond Freitas' home in Clearlake. Although the Supreme Court has on occasion referred to the obvious problems associated with warrantless, concealed entries into private residences,[6] the Court has apparently never been confronted with the question whether officers may surreptitiously enter and search a premises pursuant to a warrant without seizing any of the seizable material located therein. Since the issue appears to be one of first impression, the Court must first consider whether there exists some statutory or other basis for authorizing this type of warrant, and second, whether the order that was issued complied with the requirements of the Fourth Amendment.

### A. Jurisdictional Basis for Issuing the Warrant

The first question is whether there is any jurisdictional basis for issuing the warrant.

The Government contends that the magistrate was authorized to issue the warrant on the basis of both (1) Rule 41 of the Federal Rules of Criminal Procedure, and (2) a general common law power to regulate court procedure. Neither argument has merit.

Even though it is apparent that the form warrant used in this case was drawn from the language of Rule 41, the search that was ultimately authorized departed from its provisions in two significant respects. First, the warrant failed to require that the property described therein be seized by the executing officers, Rule 41(b), and second, it excused the officers from leaving copies of the warrant and inventory at the premises following the search, Rule 41(c). Both of these requirements were simply deleted by crossing out the applicable language on the form warrant.

■ The failure to require that the items identified in the warrant be seized is so fundamental as to bring this type of search outside the scope of Rule 41. Although the Supreme Court has stated in dictum that intangible items, such as dial impulses obtained from a pen register on a telephone line, are within the definition of "property" subject to seizure under Rule 41, *United States v. New York Telephone,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), the Court has never suggested that Rule 41 is broad enough to authorize a search designed solely to observe seizable physical property. Such "seizures" are neither expressly authorized nor contemplated by the Rule.[7]

previous but still effective warrant had already been issued.

**6.** *See, e.g., United States v. Karo,* —— U.S. ——, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984); *Alderman v. United States,* 394 U.S. 165, 178–80, 89 S.Ct. 961, 969–970, 22 L.Ed.2d 176 (1968); *Silverman v. United States,* 365 U.S. 505, 511–12, 81 S.Ct. 679, 682–683, 5 L.Ed.2d 734 (1961).

**7.** Because the Court holds that this type of search is not authorized by Rule 41, it need not consider the Government's argument that the

departures from the Rule were simply "ministerial" violations that do not justify suppression under the circumstances. *See United States v. Johnson,* 641 F.2d 652, 656 (9th Cir.1980) (in order to be entitled to suppression for non-fundamental violations of Rule 41, defendant must show legal prejudice or an intentional disregard of the Rule). It is worth noting, however, that the Government's position appears frivolous in light of the obvious prejudice to the defendant and the flagrant disregard for the provisions of Rule 41.

■ The Government also contends that the magistrate was authorized to issue the surreptitious entry order on the basis of an inherent common law power of the federal courts to issue search warrants as an element of court procedure. While there is considerable historical evidence to suggest that courts of general jurisdiction have such power, *see United States v. Torres*, 751 F.2d 875, 878–79 (7th Cir.1984), federal magistrates clearly do not. Exercising an alleged common law power to issue search warrants unquestionably constitutes the type of "inherently judicial" task which may only be performed by an Article III judge. *See, e.g., Glidden Co. v. Zdanok*, 370 U.S. 530, 549, 82 S.Ct. 1459, 1472, 8 L.Ed.2d 671 (1962); *Ex Parte Bakelite Corp.*, 279 U.S. 438, 458, 49 S.Ct. 411, 416, 73 L.Ed. 789 (1929). Although magistrates may constitutionally perform certain types of judicial functions where there is an opportunity for district court supervision or review, *see United States v. Raddatz*, 447 U.S. 667, 681–84, 100 S.Ct. 2406, 2415–2417, 65 L.Ed.2d 424 (1980); *Mathews v. Weber*, 423 U.S. 261, 266–72, 96 S.Ct. 549, 552–555, 46 L.Ed.2d 483 (1976); *United States v. Saunders*, 641 F.2d 659 (9th Cir.1980), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981), effective supervision of magistrates in the issuance of search warrants is obviously not feasible. The Court therefore concludes that the surreptitious entry was invalidly authorized.

### B. The Constitutionality of the Warrant

■ Although the magistrate had no authority to issue the surreptitious entry warrant, in evaluating the conduct of the agents it is useful to consider the more fundamental question whether the search conducted in this case was constitutional. In judging the reasonableness of a search under the Fourth Amendment, the Court must balance "the need to search against the invasion which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–1735, 18 L.Ed.2d 930 (1967). Although the privacy interests implicated here are substantial,

even highly intrusive searches may pass constitutional scrutiny provided there are sufficiently compelling reasons for the search and adequate safeguards to protect against potential abuse. However, even assuming that this type of search might be constitutional under different circumstances, it is clear that the affidavit and warrant at issue here fail to meet basic constitutional requirements.

The cases that most closely resemble the instant situation concern wiretaps and other types of electronic surveillance, which like the search at issue here, are not amenable to conventional search warrant procedures. The Government relies upon the rulings in several of these cases to support its contention that an unannounced intrusion for the purpose of collecting information about suspected criminal activity is not unconstitutional. The Government focuses primarily on *Katz v. United States*, 389 U.S. 347, 355–56, and n. 16, 88 S.Ct. 507, 513–514, and n. 16 (1967), which held that a wiretap is not unconstitutional solely because of a lack of prior notice, and on *Dalia v. United States*, 441 U.S. 238, 246–48, 99 S.Ct. 1682, 1687–1689, 60 L.Ed.2d 177 (1979), which held that the Fourth Amendment does not prohibit a covert entry to install otherwise legal electronic bugging equipment.

■ While the holdings in the wiretap cases are arguably broad enough to encompass the type of search complained of here, the lawful placement of a wiretap requires a much more rigorous showing of probable cause and is subject to greater restrictions than ordinary searches and seizures. *See Katz v. United States*, 389 U.S. at 354, 88 S.Ct. at 512; *Berger v. New York*, 388 U.S. 41, 55–60, 87 S.Ct. 1873, 1881–1884, 18 L.Ed.2d 1040 (1967). Since 1968, these requirements have been drawn from the federal statute governing intercept warrants, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2520. Among other things, Title III sets forth in meticulous detail the circumstances in which electronic surveillance is permitted, the limitations on the

breadth and duration of intercept orders, and the procedure for giving notice to persons whose conversations are overheard.

Although Title III is not directly applicable here, its provisions give content to the minimum standards of the Fourth Amendment as applied to electronic surveillance, and by the Government's own analogy, a surreptitious entry. One of the provisions in Title III that seems particlarly meaningful in this context is the requirement that an inventory of the intercepted communications be sent to the surveilled parties "within a reasonable time" after the surveillance is terminated. 18 U.S.C. § 2518(8)(d). The Supreme Court has emphasized the importance of this provision as providing a constitutionally acceptable substitute for advance notice. *United States v. Donovan*, 429 U.S. 413, 429 n. 19, 97 S.Ct. 658, 669 n. 19, 50 L.Ed.2d 652 (1977). In this case, however, the surreptitious entry warrant contained no provision whatsoever for notice to Raymond Freitas or any other interested party. Indeed, under the terms of the warrant, it is conceivable that no notice would ever have been provided to Freitas had he not been arrested shortly after the search took place. An official intrusion into a person's home without any assurance of even retrospective notice is so clearly unconstitutional as to not require further discussion.

The other provision in Title III which seems directly relevant here is the requirement that the judge make a factual determination before issuing the intercept order that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or be too dangerous." 18 U.S.C. § 2518(3)(c). The "necessity" requirement exists to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). The Hayes affidavit made no reference to the inadequacy of other investigative techniques apart from the surreptitious entry.

The affidavit merely recites the affiant's belief that a lab had been "set up" and that "[i]t would be advantageous for the investigation and the safety of the surrounding residents if agents were able to enter ... and determine the status of the laboratory." Hayes affidavit, ¶ 9. The fact that the entry would benefit the investigation, presumably by informing the agents as to the most effective time to execute the original warrants, is obviously not a sufficient reason to permit this type of extraordinary procedure. As for the implication that innocent persons in the vicinity of the Clearlake residence might be in danger if the house contained methamphetamine precursor chemicals, the amount of information presented in the affidavit is thoroughly inadequate to permit the magistrate to exercise his independent judgment as to the level of danger. The affidavit contains nothing more than the affiant's belief that hazardous chemicals are stored on the premises. It makes no attempt to describe why this particular situation presented a risk of injury different from any other investigation of a clandestine drug laboratory.

Therefore, even assuming that the special protections followed in wiretap cases would be sufficient to permit this type of entry and search, such precautions were not taken here and the Court has no difficulty concluding that the surreptitious entry of the Clearlake residence violated the Fourth Amendment.

### C. The Objective Reasonableness of the Agents' Conduct

Having concluded that the surreptitious entry and search of the Clearlake residence was unauthorized and in violation of the defendants' Fourth Amendment rights, there remains the question whether the physical evidence seized as a result of the information learned from that entry should be suppressed. The Supreme Court recently held in *United States v. Leon*, 104 S.Ct. 3405, that evidence may not be suppressed where police officers have acted in objectively reasonable reliance on a war-

rant later found to be defective. Outside of the good-faith exception announced by the Court are several well-defined situations, illustrative of unreasonable police conduct, in which suppression remains an appropriate remedy. *Id.* at 3421–22. According to *Leon*, the exclusionary rule continues to apply where the affidavit in support of the search warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1974) (Powell, J., concurring in part)), or the warrant is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." *Id.* 104 S.Ct. at 3422.

▮ The Government contends that since the agents complied with the terms of the order, the onus for any error properly rests with the magistrate. This ignores the fact that *Leon* imposes an obligation on the agents, as well as the magistrate, to ensure that a warrant is correctly obtained. The issue is not whether the executing officers blindly followed their instructions; it is "whether a reasonably well-trained officer would have known the search was illegal despite the magistrate's authorization." *Id.* at 3421 n. 23.

▮ The deficiencies in the warrant and affidavit at issue here do not turn on subtle inadequacies in the probable cause showing or minor transgressions from proper search warrant procedure. *Compare Massachusetts v. Shepard*, — U.S. ——, 104 S.Ct. 3424, 3429 and n. 7, 82 L.Ed.2d 737 (1984). On the contrary, this was a situation in which it was "plainly evident that

[the] magistrate ... had no business issuing the warrant." *Massachusetts v. Shepard*, 104 S.Ct. 3424, 3429 n. 7 (1984) (quoting *Illinois v. Gates*, 462 U.S. at 264, 103 S.Ct. at 2345 (White, J., concurring in the judgment)). The warrant was not authorized by Rule 41 or any other statute, it contained no provision for notice of any kind to the owner or occupants of the dwelling, and the reasons offered to justify the search were patently inadequate in view of the extremely serious intrusion which the search entailed.[8]

Recognizing the highly unusual nature of this search, the Court conducted a limited evidentiary hearing in order to determine whether the training provided to DEA agents was sufficient to inform the agents of the obvious constitutional problems presented by the warrant at issue here, and also to inquire into the techniques commonly relied upon in the investigation of clandestine drug labs. While the standard of reasonableness under *Leon* is an objective one, *United States v. Leon*, 104 S.Ct. at 3420 n. 20; *United States v. Sager*, 743 F.2d 1261, 1265 (8th Cir.1984), the evidence presented at the hearing lends support to the Court's conclusion that reasonably well-trained agents should have known the search was illegal. Nowhere in the extensive written training materials for DEA agents is there anything relating to a search of the type conducted here. The Assistant Special Agent in charge of the San Francisco DEA Office testified that he had never seen or heard of a warrant for this type of search and had never instructed his agents as to its validity. Without minimizing the dangers associated with the improper handling of methamphetamine

---

**8.** Although only a small number of cases have considered the effect of the *Leon* rule, the reasoning of the district court in *United States v. Segovia-Melgar*, 595 F.Supp. 753 (D.D.C.1984), provides a useful comparison tohte situation presented here. In *Segovia*, agents from the Immigration and Naturalization Service conducted a search and seizure under the general criminal laws of the United States. The court concluded that there was substantial doubt as to whether the agents had statutory authority to conduct searches for any purpose other than to locate illegal aliens, but that there was no evidence to indicate that the agents were aware of any uncertainty as to their authority. In determining that the agents acted in good faith under the rule set forth in *Leon*, the court considered it significant that a prior district court case had implied that INS agents had such authority and that the warrant utilized by the agents conformed in all respects to Rule 41. The situation in this case is very different. No court has sanctioned the type of search complained of here, nor did it comply with Rule 41 or any other authorizing statute upon which the agents could have conceivably relied.

precursor chemicals, it appears from the testimony at the hearing that there are a number of investigative techniques for safely determining when to execute a warrant for the search and seizure of suspected drug laboratories. Under the circumstances, it is impossible to draw an inference that the agents felt compelled to resort to an entry of the premises.

Although "evidence obtained pursuant to a warrant should be [suppressed] ... only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," *United States v. Leon*, 104 S.Ct. at 3419, the case at bar presents a situation in which suppression remains the appropriate remedy. The defendant's motion to suppress evidence obtained as a result of the December 13 entry and search of the Clearlake residence, including the fruits derived from that entry, is hereby granted.[9]

IT IS SO ORDERED.

9. The application of the exclusionary rule bars as evidence against Raymond Freitas (1) testimony regarding the items observed during the surreptitious entry, (2) all physical evidence seized pursuant to the warrants executed on December 20, and (3) any verbal statements Raymond Freitas may have made to agents at the house in Clearlake on December 20. *Wong Sun v. United States*, 371 U.S. at 485, 83 S.Ct. at 416; *United States v. Ceccolini*, 435 U.S. 268, 275, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978).