Filed 8/17/16  P. v. Benford CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068360 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD255130) |
| BERNARD SHERMAN BENFORD III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lisa C. Schall, Judge.  Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

On the late evening of April 1, 2014, police stopped a car being driven by defendant Bernard Benford III.  There was a controlled substance in plain view, and

ammunition was found in the trunk. Based on these and other facts provided to the officers, police obtained a search warrant for Benford's residence. The search pursuant to that warrant produced more ammunition and a cache of drugs, and a jury ultimately convicted Benford of being a prohibited person in possession of ammunition (Pen. Code, § 30305, subd. (a)(1))[1] and possession of phencyclidine (PCP) for sale (Health & Saf. Code, § 11378.5).[2]

On appeal, Benford contends the trial court erred when it denied his motion to quash the search warrant, because the warrant was unsupported by adequate probable cause. He also asserts the prosecutor committed reversible error by "vouching" during closing argument. Finally, Benford claims section 30305 violates the Second Amendment's guarantee of the right to keep and bear arms.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     Benford was charged by information with possessing phencyclidine for sale in violation of Health and Safety Code section 11378.5 (count one), transporting phencyclidine in violation of Health and Safety Code section 11379.5, subdivision (a) (count two), and being a felon in possession of ammunition in violation of section 30305, subdivision (a)(1) (count three). The information further alleged Benford had suffered a prior strike conviction and had two prison terms that constituted prison priors within the meaning of section 667.5, subdivision (b). After the prosecution's motion to dismiss count two was granted, Benford was found guilty on counts one and three. In a bifurcated proceeding, Benford admitted the prior strike allegation and admitted to one prison prior allegation. Benford was sentenced to a total term of 12 years 4 months in prison.

2

# I

# FACTUAL BACKGROUND

A. <u>The Arrest</u>

On April 1, 2014, at approximately 10:20 p.m., Officer Dyemartin of the San Diego Police Department stopped a car being driven by Benford, the sole occupant. When Benford was unable to produce a driver's license or other identification, Dyemartin ordered him out of the car.

San Diego Police Officer Cummings, who had arrived at the scene, stood near the open driver's side door as Benford got out of the car. Cummings told Dyemartin that he saw a vial of brownish, amber liquid in a vial in the map compartment of the driver's side door and believed it to be a controlled substance. Dyemartin handcuffed Benford and placed him in the back of his patrol car. When Dyemartin inspected the vial, an overwhelming chemical smell made him instantly dizzy and, based on his training, he believed the vial contained PCP. Cummings collected the vial as evidence, and Dyemartin decided to arrest Benford for possession of the substance.

Dyemartin searched the car for additional contraband and related evidence. When he searched the trunk, Dyemartin found a paper bag containing a loaded handgun magazine. Ten loose nine-millimeter rounds were also in the bag. Dyemartin ran a records check on Benford and learned he was a convicted felon, and also learned to whom the car was registered. Benford was placed under arrest and transported to the police station.

*The Search Warrant*

After Benford told police that he lived at 383 Lausanne Drive in San Diego, Dyemartin immediately sought and obtained a search warrant for the premises. Police went to Benford's residence in the early morning hours of April 2, 2014, to execute the warrant.

After Dyemartin knocked and rang the doorbell, Lilah Evans (Benford's girlfriend) answered the door. Dyemartin told her they were there to execute a search warrant. She would not open the locked security door to let them in. Instead, she said it was not her house and she had to go "wake up the old man," and then closed the front door.

While Dyemartin continued knocking on the door for several minutes, other officers told Dyemartin they heard someone rummaging around in the garage banging things, but then the noises stopped. About 30 seconds later, officers on the other side of the house said they heard things crashing down and hitting the outside concrete.

Benford's grandfather then opened the front door. Evans and Benford's grandfather were the only two adults in the house, and they were detained at the front of the house. Dyemartin then went outside to the back side of the house, where the crashing noises had come from. Below an open bathroom window officers found five vials similar to the ones found inside the car, four of which appeared to contain PCP, and the fifth, which appeared to contain PCP residue.

Officers also searched a bedroom that Evans and Benford's grandfather said was Benford's bedroom. The room had a strong chemical smell, similar to what Dyemartin had smelled coming from the car. Officers found male clothes in the closet as well as

4

Benford's driver's license, which had the Lausanne Street address. They also found Evans's purse containing her driver's license, which had a different address. Police also found a large plastic bag in the bedroom containing 56 empty clear vials.

The officers next searched the garage. Dyemartin noticed a small metal safe on a shelf; it stood out to him because it was not covered with dust like everything else. When neither Evans nor Benford's grandfather provided a key to the safe, police used a pick axe to force entry into the safe. Inside the safe, police found 15 larger vials that appeared to contain PCP, a pair of large gloves, a box of nine-millimeter ammunition, an eye dropper and a digital scale. The chemical smell coming out of the safe was so overwhelming that the officers got everybody out of the house. Evans was arrested but Benford's grandfather was not.[3]

Dashawn White, a San Diego County social worker, interviewed Benford at the jail on April 2, 2014. He admitted he lived at the Lausanne Street house, he had been dating Evans for two years and she often visited and stayed the night. He told White he knew about the PCP in the car and the ammunition in the trunk and that he had possessed them. Benford also claimed possession of everything found during the search, denied that Evans had anything to do with it and said "she was a good girl." He told White that "he was going to take the rap for all of it."

---

[3]    When Dyemartin first encountered Benford's grandfather, it appeared he had just awoken, and was elderly with apparent mobility difficulties; however, Evans had been wide awake and had no mobility difficulties. Dyemartin assumed Evans was the one who had been banging around in the garage and tossed the vials out of the window to the ground in the back.

Benford told White he did not sell any of the drugs he possessed. He claimed it was for personal use. However, a detective concluded Benford possessed the PCP for purposes of sale. The large quantity of PCP (valued at approximately $4,500) factored heavily in his opinion, and the presence of empty packaging materials and the eye dropper (often used by sellers to dispense liquid PCP) were other relevant factors. Digital scales also often indicate drug sales, though they are not usually associated with liquid PCP sales. The parties stipulated Benford was a convicted felon and that the seized vials contained a total of 228 milliliters of PCP.

## II

## ANALYSIS

A. The Challenge to the Search Warrant

Benford moved to quash the search warrant, and to suppress all of the materials seized during the search of the residence, arguing (among other things) the warrant was not adequately supported by probable cause to believe he had a firearm at his residence. The court denied the motion, and Benford asserts this was error.

*Procedural Background*

Benford moved to quash the search warrant, and sought suppression of all evidence seized pursuant to the warrant and the fruits of the evidence seized, arguing there was no probable cause for the issuance of the warrant. He claimed probable cause was absent because the only showing in support of the warrant was (1) his arrest in someone else's car and (2) an anonymous tip (given to a San Diego Police detective two

6

weeks earlier) that he had possessed a handgun. He argued these facts provided no probable cause to believe additional evidence of a crime might be found at his residence.

The prosecution filed its opposition and included, as exhibits, the transcript of the late-night phone exchange between Dyemartin, the deputy district attorney requesting the warrant, and the magistrate. During that exchange, Dyemartin described his experience in arresting, or investigation of cases involving, felons in possession of firearms and ammunition and gang members in possession of firearms and ammunition. He also described the circumstances of the traffic stop and the discovery of the ammunition. He said his records check revealed Benford was a documented and self-admitted member of the Eastside Piru and/or Skyline Piru criminal street gangs, and also indicated Benford's most recent conviction was for assault with a firearm on a person and for being a prohibited person in possession of ammunition. When asked what led him to believe Benford currently possessed a firearm, Dyemartin said that he had spoken to Detective Joe Castillo in the Gangs Division and "Detective Castillo told me that through a source of his, he [Benford] was recently within the past two weeks . . . in possession of a firearm and he was threatening people with it." Dyemartin stated that, based on all of the circumstances, he believed there was a "fair probability" a firearm would be found at Benford's residence. The magistrate authorized the requested search warrant.

The prosecution argued Dyemartin's recitation of supporting facts, including the tip from the "cooperating individual," established probable cause to issue the warrant. The prosecutor noted "the presence of a loaded handgun magazine in [Benford's] car

7

would lead a person of ordinary caution to ponder the location of the firearm to which it belongs."

The trial court held a hearing on Benford's motion to quash and motion to suppress.[4] Benford argued evidence of a crime in a car was not logically probative that a similar crime was afoot at the suspect's home. He also asserted the tip added nothing to the probable cause determination because the tip was stale, was nonspecific as to the location of Benford's possession of the weapon, and was from an anonymous informant whose veracity was not specifically discussed between Dyemartin and the magistrate. The prosecutor, after noting the magistrate's determination was entitled to deference and the magistrate had expressed no concerns with the adequacy of the showing, argued the presence of a loaded magazine and other bullets logically presented the question of where was the gun to which those items belonged, and the trial court appeared to agree the question was not *whether* there was a gun but only *where* to look for it. The prosecutor then argued that, as to the issue of *where* the gun was stashed, a person of ordinary caution could well conclude "if it's not in one's vehicle, the next place to look would be one's residence," and other factors supported the conclusion it would be found at Benford's home. The trial court appeared to agree Dyemartin's discovery of the

---

[4]    Benford also challenged the propriety of the stop of the car and the resulting vehicle search, and at the hearing Dyemartin and Cummings provided live testimony about the traffic stop, the discovery of the vial of PCP, Benford's arrest and the discovery of the ammunition in the trunk. However, both parties agreed that, because a motion to quash the search warrant is limited to the materials presented to the magistrate, live testimony would not be necessary.

8

ammunition and knowledge of Benford's criminal history supported a conclusion (even apart from the tip) he might have a firearm, but indicated those facts were less probative to the question of *where* to search for the weapon. The prosecutor reiterated the magistrate's determination was entitled to deference and, given Benford's history with gun and ammunition violations, his status as a gang member, the ammunition found in the trunk, and the tip, there was adequate cause to believe there would be a gun or ammunition at his home.[5]

The trial court, distilling the issue to be the nexus between the information provided and the *location* to be searched and noting a magistrate is entitled to rely on the opinions of experienced law enforcement officers "as to where the evidence of the crime is likely to be found" and to draw inferences about "where evidence is likely to be kept based on the nature of the evidence and the type of offense," stated that although this case presented "a close call," it would not quash the warrant.

*Legal Framework*

A magistrate may issue a search warrant on a showing of probable cause by the affiant. (§ 1525.) " 'The standard by which a magistrate must determine whether an affidavit is sufficient to establish probable cause . . . is explained in *Illinois v. Gates* (1983) 462 U.S. 213, 238-239 . . . : "The task of the issuing magistrate is simply to make

---

5        The prosecutor also addressed the issue of the relative "staleness" of the tip, pointing out that 14 days was the outer limit of how long ago Benford had possessed the gun according to the tip, and also that the tip was "refreshed" by the discovery in the trunk of the ammunition and magazine.

a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." ' [¶] Probable cause 'is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' [Citation.] It is less than proof beyond a reasonable doubt [citation]; less than a preponderance of the evidence [citation]; and less than a prima facie showing [citation]. [¶] Probable cause is a 'particularized suspicion' [citation]; it is 'facts that would lead a man of ordinary caution . . . to entertain . . . a *strong suspicion* that the object of the search is in the particular place to be searched' [citation]; 'probable cause requires only a . . . substantial chance.' [Citation.] [¶] . . . [¶] 'The essential protection of the warrant requirement of the Fourth Amendment' relies upon 'a neutral and detached magistrate.' [Citation.] The *magistrate* acts as a trier of fact in appraising and weighing the affidavit. [Citation.] He may reject an affidavit as not credible or not sufficient. He may also 'before issuing the warrant, examine on oath the person seeking the warrant and any witnesses he may produce . . . .' " (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1782-1783 (*Tuadles*), italics added by *Tuadles*.)

" 'Reasonable suspicion' may be based not only upon the circumstances and conduct recited in the affidavit but also upon the affiant's interpretation of and opinion about those circumstances and conduct. ' "Circumstances and conduct which would not excite the suspicion of the man on the street might be highly significant to an officer who

10

had had extensive training and experience in the devious and cunning devices used by narcotics offenders to conceal their crimes." ' [Citation.] [When the affiant has] extensive . . . training and experience . . . 'the magistrate could legitimately consider [his opinions] in determining probable cause for the search.' " (*Tuadles, supra,* 7 Cal.App.4th at p. 1784.)

Our standard for reviewing a trial court's ruling on a motion to suppress is well established. The defendant bears the burden of establishing the invalidity of a search warrant. (*People v. Garcia* (2003) 111 Cal.App.4th 715, 720.) The magistrate's determination as to the existence of probable cause is given " 'great deference' " and will not be overturned unless the affidavit fails as matter of law to establish probable cause. (*Fenwick & West v. Superior Court* (1996) 43 Cal.App.4th 1272, 1277-1278 ["[d]oubtful or marginal cases are resolved in favor of upholding the warrant"].)

*Analysis*

We conclude the totality of the showing made to the magistrate provided probable cause to believe Benford possessed a weapon *somewhere*. Benford was found driving a car in which a loaded magazine was stored; Benford's background of firearm offenses showed his propensity for possessing and employing firearms; he was a known gang member and Dyemartin was told of a tip (given to a Gangs Division detective) that Benford had been seen threatening people with a firearm. We agree with the trial court that the only issue was not whether there was probable cause to believe Benford *possessed* a weapon, but only whether there was probable cause to believe the weapon Benford possessed would be found in his residence.

11

A magistrate is entitled to apply common sense to the decision whether to issue a warrant. (*Fenwick & West v. Superior Court, supra,* 43 Cal.App.4th at p. 1278.) It does not defy common sense that a person who possesses a weapon, and who has shown his willingness to employ it, would store it in a secure place (because of its value and intrinsic nature, cf. *U. S. v. Bowers* (9th Cir. 1976) 534 F.2d 186, 192 [search warrant for objects upheld where the objects were "of a kind (guns, ammunitions . . . ) likely to be found where the persons involved lived"]) while also providing him ready and convenient access to it. In addition to applying his own common sense, the magistrate was entitled to (and apparently did) rely on Dyemartin's training and experience that there was a fair probability a gang member and known gun user might select his residence as the place to conceal the weapon he was prohibited from possessing. (*Tuadles, supra,* 7 Cal.App.4th at p. 1784.) Under the deferential standard of review applicable here, we conclude the trial court correctly denied Benford's motion to quash the search warrant.

Benford argues that none of the individual components of Dyemartin's evidentiary showing, when viewed in isolation, should be permitted to supply the requisite probable cause for a warrant. Benford asserts that his status as a gang member and prior handgun user, "standing alone, were irrelevant." He argues Dyemartin's training and experience added nothing because such training and experience is "not a substitute for articulable facts." He argues the ammunition and loaded magazine must be disregarded because there was no evidence Benford owned the car and the materials were not in his immediate proximity. Finally, he asserts the tip must be disregarded because it was from a person whose veracity and reliability was not revealed to the magistrate and was therefore a tip

12

from an untested and unreliable informant.  We reject Benford's argument because segregating each piece of evidence, and then testing it in isolation, appears inconsistent with *Gates's* "totality of circumstances" analysis.[6]  (Cf. *Massachusetts v. Upton* (1984) 466 U.S. 727, 732.)  We conclude Benford has not satisfied his burden of showing, as a matter of law, that the warrant was unsupported by probable cause.

B. <u>The Prosecutorial Error Claim</u>

Benford contends the prosecutor committed reversible prosecutorial error by "vouching" for the prosecutor's charging decision during closing argument.  Although Benford concedes his defense counsel did not object and that failure would ordinarily forfeit any claim of error, he asserts the claim is not forfeited in that an objection would have been futile because an admonition would not have cured the harm from the comment.  (*People v. Alvarado* (2006) 141 Cal.App.4th 1577 (*Alvarado*).)  He alternatively claims his counsel was ineffective for not objecting and reversal is warranted based on ineffective assistance of counsel.

---

[6]     Indeed, *Gates's* analysis undermines Benford's claim that the tip can provide no support for the probable cause finding.  *Gates* noted "[o]ur decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work . . . [and] an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.' "  (*Illinois v. Gates, supra*, 462 U.S. at pp. 241-242.)  Here, the tip (that Benford recently *had* a gun) was circumstantially corroborated by the independent discovery that he currently possessed ammunition *for* a gun.

*Background*

At the outset of his closing argument the prosecutor, after briefly synopsizing the testimony of the principal witnesses, noted the jury had "heard all of the numbers that I mentioned during opening statement," such as the numerical weight of the drugs found, the numerical weight for a useable amount, a number for the street value of the total amounts, and the number of rounds possessed by Benford. The prosecutor then observed that, although he had thrown a lot of different numbers at the jury:

> "I told you during opening statement there was really one number you need to keep in mind throughout this trial, the evidence shows obviously there's one person on trial, today within the past few days that's the one person, that's at issue now. One person who possessed the ammunition, one person who possessed the PCP, one person who possessed the indicia for sales. And that one person is the defendant Bernard Benford. And that one intent he had when possessing all of this PCP was for the intent to sell, and not for personal use." (Italics added.)

Defense counsel did not object to the prosecutor's use of this rhetorical device. In closing argument, defense counsel argued the evidence was equally susceptible to an interpretation Evans was the principally guilty party.

*Legal Framework*

Benford, focusing on the snippet from the prosecutor's closing argument when the prosecutor said "the evidence shows obviously there's one person on trial," argues the prosecutor engaged in improper "vouching" and that this error requires reversal.

Under federal law, " '[i]mproper remarks by a prosecutor can " 'so [infect] the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1204.) California law includes an analogous

14

proscription: " 'a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair.' " (*Ibid.*)  One form of such misconduct is described as "vouching" for the strength of the prosecution's case, which " 'involves an attempt to bolster a witness by reference to facts outside the record.' " (*People v. Williams* (1997) 16 Cal.4th 153, 257, italics omitted.)  "[I]t is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." (*People v. Huggins* (2006) 38 Cal.4th 175, 206-207.)  Thus, a statement to a jury invoking the prestige or reputation of the prosecutor's office by stating the prosecutor would not have charged a defendant unless he was guilty and imploring the jury to rely on the prosecutor's opinion and therefore convict him is prosecutorial error.  (*Alvarado, supra,* 141 Cal.App.4th at pp. 1584-1585.)

However, even when there is prosecutorial error, a defendant generally may not complain on appeal of such error if he or she does not timely object and seek an instruction admonishing the jury to disregard the impropriety.  (*People v. Young* (2005) 34 Cal.4th 1149, 1184-1185.) "In the absence of a timely objection the claim is reviewable only if an admonition would not have otherwise cured the harm caused by the misconduct." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1146.)

*Analysis*

We conclude Benford is not entitled to reversal on appeal based on the quoted snippet, for several reasons.  First, the comment about which Benford complains for the

15

first time on appeal was a rhetorical device that contrasted the flurry of numbers presented to the jury with the single person who possessed the ammunition, the PCP, the indicia for sales, and who had the single intent to sell. It contained no overt reference to the charging decision of the prosecutor, and certainly contained no invocation of the prestige or reputation of the prosecutor's office imploring the jury to rely on the prosecutor's opinion of Benford's guilt as a basis for convicting him. We therefore reject Benford's claim that there was improper vouching.

Moreover, even assuming the prosecutor's comment can be construed as containing some latent reference to the charging decision, Benford waived any claim of error by failing to object and seek an instruction admonishing the jury to disregard the impropriety. (*People v. Young, supra,* 34 Cal.4th at pp. 1184-1185.) Benford, citing *Alvarado, supra,* 141 Cal.App.4th 1577, asserts the failure to object should be excused, and the matter may be raised on appeal notwithstanding his lack of objection, because any admonition would not have cured the harm caused by the prosecutor's statement.

However, the *Alvarado* court confronted a markedly different set of circumstances. First, *Alvarado* involved a clear and unequivocal statement by the prosecutor seeking to persuade the jury to convict based on the prosecutor's reputation and opinion of the defendant's guilt.[7] Second, *Alvarado* evaluated the harmful impact of

---

7    In *Alvarado*, the prosecutor stated " 'I have a duty and I have taken an oath as a deputy District Attorney not to prosecute a case if I have any doubt that that crime occurred. [¶] The defendant charged is the person who did it.' " (*Alvarado, supra*, 141 Cal.App.4th at p. 1585.) Moreover, the prosecutor in *Alvarado* had elsewhere also stated the defendant "may have committed similar crimes against other 'little kids' [thus]

16

that statement against an evidentiary showing in which the evidence against the defendant was based almost entirely on the identification of the defendant by a single eyewitness who was extensively impeached, and "thus the evidence against Alvarado was not overwhelming." (*Alvarado, supra,* 141 Cal.App.4th at p. 1585.)

Although an admonition in that context might have been insufficient to "unring the bell sounded by the prosecutor's improper [vouching]," the present case involved neither a similar express vouching nor a similar evidentiary flimsiness. To the contrary, the alleged "vouching" was at most inferential and certainly was de minimus. Moreover, the evidence here was strong: Benford was found with nine-millimeter ammunition in the car he was driving and with more nine-millimeter ammunition in a safe in the garage of his father's house, where Benford was staying; the safe also contained the bulk PCP, along with an eyedropper and a pair of "large, male sized gloves" that a jury could infer would be awkward for a female to wear; and Benford's bedroom contained a bag with 56 empty clear vials in it. More importantly, when interviewed the day after he was arrested, Benford admitted the ammunition and drugs found in the car and the house were his;[8] he denied only that the PCP was possessed for sale. In this milieu, we reject Benford's claim

suggest[ing] to the jury that she had additional evidence of his guilt that had not been presented, further strengthening the improper inference that the jury should rely on her opinion and convict him on that basis." (*Id*. at p. 1586.)

[8]    Although the record is unclear, it appears Benford volunteered that he knew the location where the drugs were kept. Specifically, the social worker told him she understood there were empty vials found in the house on his bed, and "he said he keeps them locked in a safe."

17

that the admonition would not have cured the harm from any inference of vouching a jury might have drawn from the prosecutor's opaque statement, and therefore we conclude the claim of error was forfeited by failure to object.[9]

C. The Second Amendment Claim

Benford claims his conviction for being a felon in possession of ammunition violates his Second Amendment rights. The arguments raised by Benford have been previously rejected by this court (see *People v. Flores* (2008) 169 Cal.App.4th 568), as well as other courts (see, e.g., *People v. Delacy* (2011) 192 Cal.App.4th 1481), and he has presented no persuasive reason to depart from the analysis of those decisions.

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.

---

[9] For the same reasons, we reject Benford's alternative claim asserting the failure to object requires reversal based on ineffective assistance of counsel. The comment complained of was opaque and innocuous, and the evidence against Benford was strong (cf. *People v. Hines* (1997) 15 Cal.4th 997, 1047), and therefore Benford's claim of ineffective assistance of counsel fails because he has not demonstrated there was a reasonable probability of a more favorable result had counsel objected and received a curative admonition. (*People v. Williams, supra,* 16 Cal.4th at p. 215.)

18